# THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

FILED
RICHARD W. NAGEL
CLERK OF COURT

2020 AUG 12 PM 12: 52

U.S. DISTRICT COURT
SOUTHERN DIST. OHIO
EAST. DIV. COLUMBUS

SCOTT DAVID CREECH

    PLAINTIFF,

v.

OHIO DEPARTMENT OF
REHABILITATION AND
CORRECTIONS, eT. aL.,

    DEFENDANT.

CASE NO.: 00104

JUDGE JAMES L.
GRAHAM

MAGISTRATE
CHELSEY M.
VASCURA

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT PURSUANT TO (FED R.CIV. PROC. 56(a)

NOW COMES The PLAINTIFF, SCOTT David Creech, WiThouT COUNSEL, and respecTFully Moves This courT For summary Judgment against DefendanTs' and requesT ThatThis courT render a Judgment For The PLaintiff For all, or whatever relief This courT deems

FIT IN PLAINTIFF'S Second Amended Complaint.

1.) The Plaintiff is entitled to summary judgment because, as more fully shown in the complaint, exhibits, and affidavit of verity, there is no genuine dispute as to any material fact that need to be tried in this action.

a.) The Pleadings in this action show a clear violation of Title II of the Americans with Disabilities Act (ADA) under 42 U.S.C.S. Section 12131 ET. SEQ. Plaintiff has and will further prove that he has a disability by restating in the complaint that he did receive Social Security for said disability up until his incarceration in October 2008. The Exhibits in the complaint establish this fact along with additional Exhibits attached herein. See Exhibit A. Medical records of severe motor vehicle accident.

b.) Plaintiff has also shown through the Exhibits that he is a qualified individual with a disability under U.S.C., Section 12102 (1)(A)(B), (2)(A). Also See Exhibit B

Pg 2

attached herein, Responses To Plaintiff's
Request For Admissions To The Defendants.
On Page Four (4), question or admission: No. 4

4.) Admit That The Defendants' — Through Med-
ical Services — continue To reissue said
Mobility device up until 8/23/16 when The
Defendants determine[d] That due To
Plaintiff's ability To walk with a swift
gait he had no disability.

Response: Admit

Page 4 and 5: question or admission Number
6.

6.) Admit That The Defendants after examin-
ing Plaintiff's medical records and during
a recent medical examination on 9/19/19
determine[d] That Plaintiff required a
Mobility device and reissued Plaintiff
a cane on or about That date.

Response: Admit.

C.) Plaintiff has shown That Defendants
discriminated against him in Exhibit C

Pg 3

and D of The COMPLAINT, wherein he Filed an "APPEAL TO The chief INSPECTOR" concerning his mobility aid (i.e. cane), stating that he is an american with a disability and that The State of Ohio and Ohio Department of Rehabilitation and corrections (i.e. O.D.R. C) is in violation of The American with Disability ACT (i.e. ADA) which put O.D.R.C on notice that They were in violation of The act, and that Nurse PracticTioner Gary Artrip's removal of his cane was The Primary reason for The grievance.

However, The decision of the chief Inspector, when confronted with this clear civil right violation, upheld N.P. Artrip's decision on August 23, 2016 To deny Plaintiff The use of his cane.

d) Plaintiff has and will continue To Suffer damages as a direct result of discrimination by N.P. Artrip's decision To remove his mobility aid, and O.D.R.C.'s decision To uphold N.P. Artrip's removal of his cane, As Stated in The complaint, when on August 23, 2016, N.P. Artrip overrode The orthopedic Surgeon's order for The continued use of The

Pg 4

cane, Plaintiff has suffered extreme pain issues and has had multiple incidents where he has been unable to walk any distance beyond the unit without falling. See Exhibit C, Declarations of the Plaintiff, as well as other Inmate Declarations who witnessed the deprivation and further injury—due to the removal of his mobility aid.

Several of the health care providers at C.C.I. suggest that the Plaintiff walk as much as possible each day for exercise, and ordered he use the cane whenever ambulatory or walking as needed—This prior to the cane being seized by one of the medical providers. A major life activity under 42 U.S.C. Section 12102 (2)(A). O.D.R.C.'s failure to accommodate said disability prevents full access to the library and access to exercise facilities at the gym and/or yard. Not eating at the chow hall became a regular way of life during the time the cane was seized.

## MEMORANDUM OF LAW

Title II of the ADA provides that "No

Pg 5

qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." U.S.C.S. 12132 (2000 ed.). A qualified individual with a disability is defined as "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C 12131(2). The Act defines "public entity" to include "any state or local government" and "any department, agency, ...or other instrumentality of a state." 12131(1). See United States v. Georgia, 546 U.S. 151, 154, 126 S. CT. 877, 163 L. Ed. 2d 650 (2006). Citing Pa Dep't of Corrs v. Yeskey 524 U.S. 206, 210, 118 S. CT. 1952, 141 L. Ed. 2d 215 (1998). This term includs state prisons. Title II of the

Pg 6

ACT authorizes suits by Private citizens For money damages against Public entities That violate 12132. See 42 U.S.C. 12133.

The O.D.R.C. and Public officials acting in his or her official capacity may be a Proper defendant under ADA Title II claim, See Carten v. Kent State Univ, 282 F. 3d 391, 396-97 (6Th cir. 2002). However, in order to Stat a claim, The Plaintiff bears The burden of demonstrating That he is a qualified individual with a disability. See Tucker v. Tennessee, 539 F. 3d 526, 533 (6Th cir. 2008). An individual is disabled under The ADA if she or he (1) has a Physical impairment That substantially limits one or more Major Life activities, (2) has a Physical record of such impairment or (3) is regarded as having such impairment. See Talley v. Family Dollar Stores of Ohio Inc, 542 F. 3d 1099, 1105 (6Th cir. 2008).

Several courts' have recognized That a Medical condition which Threatens a Plaintiff's ability To walk, even on a NonPermanent basis, constitutes a serious medical need. Taylor v. Plousis, 101 F. Supp.

2d 255, 262 (D.N.J. 2000) (Citing Kaufman v. Carter, 952 F. Supp. 520, 527 (W.D. Mich. 1996). A medical condition that threatens one's ability to walk, even if reversible, is unquestionably a serious matter. Johnson v. Hardin City, 908 F. 2d 1280, 1283-84 (6th Cir. 1996).

## CONCLUSION

This motion is made under Civ. R. 56(c) which provides in part, as follows:

(c)... Summary Judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

There remains no genuine issue of material fact between Plaintiff and Defendant on the issue of discrimination under Title II of the ADA. Therefore, Summary Judgment must be granted.

STATE OF OHIO        |SS

COUNTY OF ROSS       | AFFIDAVIT IN SUPPORT
                     | OF SUMMARY JUDGMENT

I, SCOTT David Creech, do hereby attest and swear all Facts and Statements in his Motion For Summery Judgment against The Ohio Dep't oF Rehab. and Corr. and herein are True and accurate To The very best oF my Knoledge.

In addition, I State The FollOwing:

1.) That all oF The Exhibits in The Motion For Summary Judgment are True and accurate copys oF The original hospitol reports, Responses To Plaintiff's Admissions, and, Declarations oF Incarcerated Individuals;

2.) That The Exhibits in This action Prove That Plaintiff was and still is a disabled Person beFore entering into The Ohio Dep't oF Corrections;

3.) That since The arbitrary removal oF The Plaintiff's cane, he has, and

Pg 1.

has Further Proved That he has Suffered extreme difficult Periods with mobility and standing, making it nearly impossible To work, walk, exercise, and Perform daily Life activities:

4.) That Plaintiff has suffered Further injury due solely from The removal of his cane, which had To be reissued on September 19, 2019, by Dr. Peppers, who spoke with N.P. ArTrip about his decision remove his mobility aid.

5.) As More Fully Shown in Plaintiff's Motion For Summary Judgment, he has established all Four elements of an ADA Claim, and is entitled To Summary Judgment as a matter of Law.

Scott David Creech

SCOTT David Creech

Sworn To And Subscribed In My Presence This 5th Day of August 2020.

Christine A. Apsley

Notary Public

Pg 2

My commission Expires
5-20-2023

Respectfully Submittal,

Scott W Creech
SCOTT D. Creech A587712
C.C.I. P.O. Box 5500
Chillicothe, Ohio Y5661

## CERTIFICATE OF SERVICE

A True and accurate copy of The fore-going MOTION For Summary Judgment has been Served ou counsel For Defendant, Thomas E. Madden, at 150 East Gay Street 16Th Floor, Columbus, Ohio 43215 on The ___ day of August 2020, by regular U.S. Mail.

Scott W Creech
SCOTT D. Creech

Pg 9

This MOTION CONSIST OF The FOLLOWING documents:

Pg.

1. MOTION FOR Summary Judgment     1-6

2. Memorandum OF Law     6-8

3. CONCLUSION     8

4. AFFidavit IN SUPPORT OF Summary Judgment   8-9

5. CerTiFicaTe OF Service     9

6. This Page     10

7. Exhibit-A Medical Documents Total - 85 pgs.

8. Exhibit-B Admissions Defendants Total - 6 pgs.

9. Exhibit-C Declarations Total- 9 pages

2019-09-23 05:47       CCI-Wardens Office 7407795398 >> Remote ID        P 40/41

**Chillicothe Correctional Institution**
P.O. Box 5500 15802 State Route 104 North  Chillicothe, OH 45601
(740) 774-7080  Fax:

*September 23, 2019*
Page 1
ALP Sick Call

**SCOTT DAVID CREECH (A588782)**
Male  DOB:                    1871377729

**DEFENDANT'S EXHIBIT**
59
11·8·19 Creech

**09/19/2019 - ALP Sick Call: discuss restrictions, wants cane and no lifting**
Provider: Sonya Peppers-MD
**Location of Care: Chillicothe Correctional Institution**

RECEIVED
JAN 0 3 2020
CHILLICOTHE CORRECTIONAL INSTITUTION

-3
**Encounter Context**
Facility at time of evaluation: Chillicothe Correctional Institution
**Age at Time:** 62 Years Old

**Current Vital Signs**
Date/Time Vitals were taken:  September 19, 2019 2:46 PM
Previous Height: 73 (09/10/2019 8:39:11 AM)   Previous Weight: 220 (09/10/2019 8:39:11 AM)

Does weight include shackles? Without Shackles
**Current Weight (lbs) with or without shackles:** 218  **Current Height (in.):** 73
BMI: 28.87  **Sitting BP:** 120 / 78
**Temperature:** 97.6  **Temperature site:** Oral
Pulse rate: 85Respirations: 16  **Respiration Type:** Regular
**Pulse Ox%** 96  **Room Air:** Yes

**HPI**
Chief complaint: REQUESTS FOR RESTRICTIONS
History of presenting illness: PT PRESENTS REQUESTING A CANE AND LIFTING RESTRICTIONS.
PT WITH HX OF RIGHT ACL TEAR, CHRONIC A/C SEPARATON, CERVICAL SPONDYLOSIS,
CHRONIC LOW BACK AND IS HAVING DIFFICULTY GETTING AROUND THE COMPOUND.  STATES
THAT HE HAD A CANE FROM 2011-2016 BUT IT WAS TAKEN AWAY.  STATES THAT HE HAS BEEN
TRYING TO GET HIS CANE BACK FOR THE LAST 3 YRS.

**Physical Examination**
Musculoskeletal

**General**
Patient is alert and oriented and in no acute distress
**Obese**  No
**Diaphoretic** No
**Answers questions appropriately.** Yes
**Able to speak in full sentences.** Yes

**Cardiovascular**
Regular rhythm, no murmurs or gallops.

**Gastrointestinal**
Abdomen soft, non-tender, bowel sounds present, no masses, no hepatomegaly.

**Rectal**
**Hemoccult Previous**
Negative (09/06/2019 3:10:00 AM)

Exhibit - A
85 pages Total

**Chillicothe Correctional Institution**
P.O. Box 5500 15802 State Route 104 North Chillicothe, OH 45601
(740) 774-7080 Fax:

*September 23, 2019*
*Page 2*
*ALP Sick Call*

## SCOTT DAVID CREECH (A588782)
Male DOB      1871377729

### Respiratory
Lungs clear to auscultation with no wheezing, rales, or rhonchi

### Gait
Ataxia No
ANTALGIC GAIT FAVORING RIGHT KNEE - WIDE BASED BENT KNEE GAIT

### Cervical Spine
**Full Range of Motion No**
LIMITED 2' TO PAIN - CHRONIC
**Limited Range of Motion Yes**

### Assessment
**Prior Problem List:**
Nocturia (ICD-788.43) (ICD10-R35.1)
Lumbago with sciatica, left side (ICD-724.3) (ICD10-M54.42)
Cortical, lamellar, or zonular cataract, nonsenile, OU (ICD-366.03) (ICD10-H26.019)
Shoulder disorder (ICD-719.91) (ICD10-M25.9)
Unspecified essential hypertension (ICD-401.9) (ICD10-I10)
Other and unspecified hyperlipidemia (ICD-272.4) (ICD10-E78.5)
Chronic hepatitis C without mention of hepatic coma (ICD-070.54) (ICD10-B18.2)
Degeneration of cervical intervertebral disc (ICD-722.4) (ICD10-M50.30)
Other malaise and fatigue (ICD-780.79)
Cardiac / Hypertension
Hyperlipidemia
Liver Disease
Rosacea (ICD-695.3)

### Plan
CHRONIC JOINT ISSUES IN AN OLDER PATIENT AMBULATING AROUND LARGE CAMPUS
WILL OFFER CANE X 1 YR.
NO INDICATION FOR LIFTING RESTRICTION TO CARRY HIS COMMISSARY
NSAIDS OTC PRN
EDUCATED PATIENT NEED FOR STRETCHING AND STRENGHTHEING AND RECULAR EXERCISE.
F/U IN DSC PRN
**Education Provided:** Exercise

### New Orders

Electronically signed by Sonya Peppers-MD on 09/19/2019 at 3:45 PM

| Wt | | |
|---|---|---|
| 221.2 | 05/01/2019 01:04:55 PM | Jessica Brown-RN |
| **BMI** | | |
| 29.18 | 05/01/2019 01:04:55 PM | Jessica Brown-RN |

## Examination

General Examination:

GENERAL APPEARANCE: WN WD WM IN NAD CA&OX4.
ANTALGIC GAIT. .

CARDIOVASCULAR: normal S1 and S2, regular rate and rhythm, no murmur or gallop.

RESPIRATORY: clear to auscultation bilaterally, no wheezes, rhonchi, rales.

GASTROINTESTINAL: normal bowels sounds, no guarding, no bruit, no masses palpated, no tenderness.

NEUROLOGIC EXAM: non-focal exam.

EXTREMITIES:

STRENGTH 5/5 BILATERALLY, REFLEXES +2 BILATERALLY, WALKS WITH LIMP.

## Assessments

1. Degeneration of cervical intervertebral disc - 722.4 (Primary), Degree Of Control-Good,Clinical Status-Stable

## Treatment

**1. Degeneration of cervical intervertebral disc**
WILL REVIEW HIS OLD RECORDS TO DETERMINE NEED FOR A CANE.
PT WITH HX OF OLD CHRONIC INJURIES AND ADMITS THAT HE DOES NOT USE THE CANE HE JUST HAS IT JUST IN CASE.
ADVISED PATIENT TO CONT NSAIDS OTC PRN
ADVISED PT TO USE CARE WITH AMBULATION.
ENCOURAGED PATIENT TO CONT EXERCISING AS HE WAS WALKING 4MILES A DAY IN THE PAST AND IS NO LONGER EXERCISING AS HE DOES NOT HAVE HIS CANE.
NO INDICATION FOR CANE.
WILL NOT RENEW UNLESS AN INDICATION BECOMES AVAILABLE.

**2. Others**
Action Started- NSG- Medical Record Release Request Processing

**Follow Up**
DSC, prn

Patient: CREECH, SCOTT DAVID  DOB: REDACTED  Progress Note: Sonya A Peppers-MD  05/01/2019
Note generated by eClinicalWorks EMR/PM Software (www.eClinicalWorks.com)

https://ecwapp.drc.ohio.gov:8080/mobiledoc/jsp/catalog/xml/printMultipleChartOptions.js...  6/19/2019

AGO Response to Discovery Request
000023



Guarantor: CREECH, SCOTT DAVID

## CREECH, SCOTT DAVID

BCI: REDACTED InmateID: A588782
Facility Code: CCI Housing Area: C C1 B 166
62 Y old Male, DOB: REDACTED
P.O. BOX 5500, CHILLICOTHE CORRECTIONAL INSTI,
CHILLICOTHE, OH-45601
Home: 740-774-7080

Appointment Facility: Chillicothe Correctional Inst.

04/25/2019

Progress Note: Default Provider A-Nursing

**Current Medications**
None

**Mental/Medical History**
HTN
Hep C with + VL on 8/2012
Hyperlipidemia (2008)
DDD C-spine
DVT (L leg) in 2008
cancer BCC
Joint problems
Schizoaffective disorder, Depressive type
Schizoaffective disorder, Depressive type
Posttraumatic stress disorder
Posttraumatic stress disorder

**Chief Complaint**
1. Multiple

**History of Present Illness**
NAF - Musculoskeletal System:
    History of Presenting Illness:  my health has been deteriorating for a while now and I can not hardly get around very good without a cane. I would also like a knee and back brace, Onset:  it been going on for years, Location:  right knee has an acl torn, and herniated disk in my back, Aggravating factors:  trying to turn or uneven ground, Relieved by:  having a cane for support, Symptoms:  moderate pain worsening with movement, joint pain, aches and pains of bones, muscles and/or joints, stiffness. Significant Medical History:
    . Objective/Physical Assessment:    , General Appearance:  pt appears to have difficulty standing from a sitting position. pt with steady gait. states that he does not always have pain and he doesn't limp for it doesn't hurt, Musculoskeletal:  pain not relieved by immobilization, Neurovascular exam:  distal pulses present and equal bilaterally, capillary refill is less than or equal to 2 seconds, skin is warm and pink, sensation to light touch is equal bilaterally, patient is able to detect movement of a digit (proprioception), patient is able to wiggle fingers and toes. Nursing Assessment:    , Nursing Diagnosis  Activity Intolerance R/T knee and back pain. Nursing Care Plan:
    , Immediate Nursing Actions-  referred to alp for evaluation. Patient Education:    , Patient verbalizes understanding of- signs and symptoms needing attention including numbness, decreased function, increased pain, and elevated temperature, the need for treatment and follow-up care, Medication actions, dosing and side effects, the importance of the need for rest of the involved joint or limb, provided education about back care, advised to rest involved joint. Disposition:
    , Action taken- No restrictions on activity.

**Vital Signs**

| Temp | | |
|------|------|------|
| 98.4 | 04/25/2019 10:23:26 AM | Lori Lemaster-RN |
| **Pulse Radial** | | |
| | | |

AGO Response to Discovery Request
000025

412754 N

# CONSULTATION REQUEST

| To: Optometry | From: | ☐ Follow-Up ☐ New |
|---|---|---|
| Date Requested: 3-13-14 | Date Scheduled: | Appointment Date: |

### PERTINENT HISTORY RELATED TO REASON FOR REFERRAL

To include:   Lab data,   Current meds,   Response to treatment,   Previous consult recommendations.

Hx of Brain Damage
Double Vision
Poor Balance

| Provisional Diagnosis: Blurred Vision | | |
|---|---|---|
| Inst. Referring Physician: | Inst. Medical Director: | ☑ Routine ☐ ASAP |

### CONSULTATION REPORT AND RECOMMENDATIONS

SEEN IN
VISION CLINIC

(Continued on reverse side white copy)   ☐ Yes   ☐ No
*Provide Inmate Name & Number*

| Inmate #: A 586 762 | Institution: CCI | Consultants Signature and Title: |
|---|---|---|
| Name (Last, First, Mi): Creech | | Date Seen by Consultant: 4/8/14 |
| OSU #: | SSN #: | Inst. Reviewed by: | RN Date: |
| Release Date: | Race: | Sex: | DOB: | Inst. Reviewed by: | MD Date: |

AGO Response to Discovery Request
000034

Ohio Department of Rehabilitation and Correction
Nursing Assessment/Protocol

# Miscellaneous

| | Number: 588782 | DOB: REDACTED |
|---|---|---|
| Creech | Date: 7/31/15 | Time: 615pm |
| stitution: CCI | | |

**Subjective Data:**

1. Patient Complains of: I need to have my bottom bunk restriction removed. I have been having increased pain in my R foot. I also am having trouble c my R eye.

**Significant Medical History:**

| | Y | N | Comment | | Y | N | Comment |
|---|---|---|---|---|---|---|---|
| Asthma/COPD | ☑ | ☐ | as a child | Recent injury | ☐ | ☑ | |
| Cardiac Disease | ☑ | ☐ | HTN | Recent surgery | ☐ | ☑ | |
| Diabetes | ☐ | ☑ | | Strenuous physical exercise | ☐ | ☑ | |
| Documented weight loss | ☐ | ☑ | | Tobacco use | ☐ | ☑ | |
| Head injury | ☑ | ☐ | Aug 1999 | Ulcer disease | ☐ | ☑ | |
| History of TB Infection | ☐ | ☑ | | Dehydration: | ☐ | ☑ | |
| HIV disease/splenectomy | ☐ | ☑ | | Exposure to Hot Environment: | ☐ | ☑ | |

**Objective Data:**

1. T 97.3 P 66 R 18 B/P 123/85 Weight: 208.4
   Pulse ox: _____ PEF: _____
2. EENT assessment: ordinary R eye red. / or defects noted in other areas
3. Cardiac assessment: HR reg rate/rhythm
4. Lung assessment: C + A
5. Abdominal assessment: BS ⊕ ✗ 4

6. Genitalia exam: deferred
7. Extremities: slight limp c ambulation / ambulates c cane
8. Skin assessment: Intact
9. EKG: deferred
10. Urine Dipstick: deferred

**Nursing Assessment** (see appropriate nursing assessment guideline)
Consistent with patient signs and symptoms:

☐ Acute Pain R/T: _____
☐ Risk for infection R/T: _____
☐ Altered elimination R/T: _____
☐ Impaired skin integrity R/T: _____
☐ Chronic Pain R/T: _____
☑ Altered Comfort R/T: increased pain R foot/leg c
☐ Hyperthermia R/T: _____

**Nursing Care Plan:**
Refer to advanced health provider immediately if:

☐ Temp. ≥ 101°
☐ C/O Chest pain
☐ C/O Exertional dyspnea with or without chest pain
☐ Sign/symptoms of Influenza
☐ Dependent edema
☐ Pain/symptoms > 2 weeks
☐ Severe, disabling pain
☐ Dark or bloody urine

**Nursing Interventions** (check medications ordered)

* Mbduprosen 12 pkg
- eye oint Artificial Tea
☐ _____
☐ _____
☐ _____

17 (Rev. 03/13)

AGO Response to Discovery Request
000035

**Note:** Stopping of an order is to be written as a specific new order.

**PLEASE PRESS FIRMLY — YOU ARE MAKING TWO COPIES.**

| WRITE OR IMPRINT PATIENT INFORMATION | ORDERS |
|---|---|

Run addressograph machine over patient's nameplate only.

Allergies:

Creech
588 782

Date: _____ Time: 6 months
Abatoprolol 100 mg po BID
HCTZ 12.5 mg po QD
Nuvasc 10 mg po QD
Losartan 50 mg po QD
ASA 81 mg EC po QD
Pravachol 40 mg po qHS

NOTE: If TO — Was order written, read back and verified by Physician? ☐ Yes ☐ No
Physician Signature: _____  Nurse Signature: _____
Date: 5/21/13 Time: 10  Date: 5/21/13 Time: 1145

| Unit/Ward: | Verification Signature: |
|---|---|
| | Date: Time: |

Creech, Scott
588782

REDACTED
DDB

Allergies: NKDA

Date: 9-11-13 Time: 345
↑ HCTZ 25 mg PO Q AM
↓ metoprolol 50 mg PO BID
Norvasc 10 mg PO Q
Losartan 50 mg PO Q 145
ASA EC 81 mg PO Q H
Pravachol 40 mg PO Q 145

NOTE: If TO — Was order written, read back and verified by Physician? ☐ Yes ☐ No
Physician Signature: _____  Nurse Signature: _____
Date: 7/11/13 Time: 345  Date: 9/11/13 Time: 1440

| Unit/Ward: | Verification Signature: |
|---|---|
| | Date: Time: |

Creech, Scott
588782

REDACTED

Allergies: NKDA

Date: 9-11-13 Time: 345
BP check Q week
X 3 weeks

BOO / Care X 6 months

NOTE: If TO — Was order written, read back and verified by Physician? ☐ Yes ☐ No
Physician Signature: _____  Nurse Signature: _____
Date: 9/11/13 Time: 345  Date: 9/11/13 Time: 1440

| Unit/Ward: | Verification Signature: |
|---|---|
| | Date: Time: |

DMH-0020 (Rev. 2/04)  Distribution: White – Medical Record, Green – Pharmacy, Canary – Dietary

**Note:** Stopping of an order is to be written as a specific new order.

PLEASE PRESS FIRMLY — YOU ARE MAKING TWO COPIES.

| WRITE OR IMPRINT PATIENT INFORMATION | ORDERS |
|---|---|
| Run addressograph machine over patient's nameplate only. | |

Scott
Creech
588782

DOB –
REDACTED

Unit/Ward: CCT
Verification Signature:
Date: Time:

Allergies: NKDA
Date: 9-26-12 Time: 1245
wound care DD
Til healed

NOTE: If TO – Was order written, read back and verified by Physician? ☐ Yes ☐ No
Physician Signature: _____ CNP  Nurse Signature: _____
Date: 9-26-12 Time: 1245  Date: 9/26/12 Time: 535

---

Scott
Creech
588782

DOB –
REDACTED

Unit/Ward: CCT
Verification Signature:
Date: Time:

Allergies: NKDA
Date: 10/5/12 Time:
Renew:
Bottom bunk restriction, cane X/yr

NOTE: If TO – Was order written, read back and verified by Physician? ☐ Yes ☐ No
Physician Signature: _____ CNP  Nurse Signature: _____
Date: 10-9-12 Time: 1023  Date: 10-9-12 Time: 025

---

Scott
Creech
588782

DOB –
REDACTED

Unit/Ward: CCT
Verification Signature:
Date: Time:

Allergies: NKDA
Date: 11-27-12 Time: 1430
Schedule CCC
Review Labs & A

NOTE: If TO – Was order written, read back and verified by Physician? ☐ Yes ☐ No
Physician Signature: _____ CNP  Nurse Signature: _____ Lamier ____
Date: 11/27/12 Time: 1430  Date: 11.27.12 Time: 1511

Ohio Department of Rehabilitation and Correction

**Chronic Disease Clinic Follow-Up**

Inmate Name: _Reech_

Number: _588782_  Institution: _CCI_

**List chronic diseases:**

| | | | |
|---|---|---|---|
| 1.) | Cancer - BCC | 3.) | Lipids |
| 2.) | HTN | 4.) | Liver |

**Interval History:** 59 y.o. w.m. denies hx of MI

**Subjective:** Denies chest pain, dyspnea or myalgia

Asthma: # attacks in last month: _____

# short acting beta agonist canisters in last month: _____

# times awakening with asthma symptoms per week: _____

Seizure Disorder: # seizures since last visit: _____ Date: _____

Diabetes Mellitus: # of hypoglycemic reactions since last visit: _____

Weight Loss / Gain: _____ #lbs

| TB/COPD ☐ | Chest Pain ☐ | SOB ☐ | Productive Cough ☐ | Edema ☐ |
|---|---|---|---|---|
| CV/Hypertension ☐ | Night Sweats ☐ | Palpitations ☐ | Fever ☐ | |

HIV/HCV: ☐ Nausea/Vomiting  ☐ Abdominal Pain/Swelling  ☐ Diarrhea  ☐ Fever  ☐ Rashes/Lesions

☐ Other

☐ Yes ☑ No  For all diseases, since last visit, describe new symptoms: _____

Patient Compliance with: Medications: ☑ Yes ☐ No  Diet: ☑ Yes ☐ No  Exercise: ☑ Yes ☐ No  Predicted PEFR _____

**Vitals:** Temp 97.0  BP 120/84  Pulse 64  Resp 16  Wt. 210  Last Wt. 208  Accurate PEFR _____

**Labs:** Hgb A1C ____ HIV VL ____ CD4 ____ Tot Chol 145  LDL 50 HDL 80  ALT/AST 03/17 Trig 177 INR ____

Range of fingerstick glucose/BP monitoring:

**PE:**

HEENT/Neck: _____

Heart: _____

Lungs: _____

Extremities: _____

Abdomen: _____

Other: _____

**Assessment:** Diagnoses

| | Degree of Control | | | | Clinical Status | | | |
|---|---|---|---|---|---|---|---|---|
| | G | F | P | N/A | I | S | W | N/A |
| 1. Cancer | ☑ | ☐ | ☐ | ☐ | ☑ | ☐ | ☐ | ☐ |
| 2. HTN | ☑ | ☐ | ☐ | ☐ | ☑ | ☐ | ☐ | ☐ |
| 3. Lipid | ☑ | ☐ | ☐ | ☐ | ☑ | ☐ | ☐ | ☐ |
| 4. Liver | ☑ | ☐ | ☐ | ☐ | ☑ | ☐ | ☐ | ☐ |

**Plan:** pt ed on meds + on metoprolol.

Medications/Diagnostics/Referrals: _____

Labs: FLP cmp

Monitoring: BP: ____ X day / week / month  Glucose: ____ X day / week / month  Peak flow ____ Other ____

Education provided: ☑ Nutrition ☑ Exercise ☐ Smoking ☐ Test Results ☑ Medication Management ☐ Other

# days to next visit: ☑ 90 ☐ 60 ☐ 30 Other: _____ Discharge from: _____

Advance Level Provider Signature _____ Date: 2-5-17

DRC5452 (Rev. 09/10)

HT 6'1"  BMI 29

AGO Response to Discovery Request
000069

Ohio Department of Rehabilitation and Correction
# Chronic Care Clinic Follow-Up
List chronic diseases:

Inmate Name: Creech
Number: 588782
Institution: CCI

| (1) | HTN | (2) | LIPID |
|-----|-----|-----|-----|
| (3) | LIVER | (4) | |

History: (Attach a progress form, if needed, to provide a more complete history.)
Pharmacy profile attached (or list current medication here) 55 y/o. c/o Otology in to (R+) Aur. cle.
prot 2 was sur whitish ear drainage.

### Complaints/Problems:
CV/Hypertension: Chest Pain: ☐ Yes ☒ No
SOB: ☐ Yes ☒ No

Diabetes Mellitus:
# of hypoglycemic reactions since last visit: _____

ALL DISEASES: other new symptoms: (if Yes explain)
☒ Yes ☐ No

☐ HIV Infection: weight loss, skin changes, thrush
Seizure Disorder: # seizures since last visit: _____
Asthma: # attacks in last month: _____
# short acting beta agonist canisters in last month: _____
# times awakening with asthma symptoms per week: _____
Medication Side Effects: _____

chronic back pains.
buprofen, CTM - sinus Othu OTC
huphamonine mALAse Yng- need taken

Patient compliance with medications: ☒ Yes ☐ No     diet: ☒ Yes ☐ No     exercise: ☒ Yes ☐ No

*Any abnormal findings must be described in the Interdisciplinary Progress Notes.
**Vitals:** BP 183 Temp 96.5 Wt. 205.2 Pulse 80 Resp 110 PEFR _____

**Labs:** Hgb A1C ___ VL ___ CD4 ___ Total Chol 130 LDL 94 HDL 29 Trig 156

**EXAM:** HEENT/Neck: ☒ JVD, ☒ control Heart: no u SISZ A++ 1/12 LAAV
Lungs: CTA ☒ Phi) TM rt injected-bulsr Commun Abdomen:
Extremities: ☒ edema; pedal pulvas pal p☒ Rectal: N/A
Neurological: CN I-XII - m lact     Other: SLW: ☒ x Anth avou, ☒ j Avrl fo

### Assessment: Diagnoses

1. HTN
2. Hep C
3. Hyperlipidemia
4.

| | Degree of Control | | | | Clinical Status | | |
|---|---|---|---|---|---|---|---|
| | G | F | P | N/A | I | S | W | N/A |
| 1. | ☒ | ☐ | ☐ | ☐ | ☐ | ☒ | ☐ | ☐ |
| 2. | ☒ | ☐ | ☐ | ☐ | ☐ | ☒ | ☐ | ☐ |
| 3. | ☐ | ☐ | ☐ | ☐ | ☐ | ☒ | ☐ | ☐ |
| 4. | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |

**Plan:** Educated on proper use of Piloxea/ Amoxil tx of Aur otitis med.a Add bowsh Debix e A st5 Comgy
Medications: Omeprazle, Losartan, Metoprolol, Amlodipino, Prmootron.
Diagnostics: AJAEC, HCTZ
Labs:

Monitoring: BP: ___ X day / week / month     Glucose: ___ X day / week / month     Peak flow     Other: _____
Education provided: ☒ Nutrition ☒ Exercise ☒ Smoking ☒ Test Results ☒ Medication Management ☐ Other
Referral: Specialist (indicate type): _____     Other Chronic Care Program (specify): _____
# days to next visit: ☒ 90 ☐ 60 ☐ 30 Other: _____     Discharge from (specify): _____

Advance Level Provider Signature:     Date: 5/3/12

DRC5452 (04/06)

# Franklin Medical Center

1990 Harmon Ave., Columbus, OH 43223-0658

(614) 445-5960 Radiology Ext. 2734

---

**CREECH, SCOTT**     Inmate# A588782     Inst: CCI     Req# 150097899

CERVICAL SPINE     Exam Date# 8/6/2015

Indication; Neck pain
Five images
Mild to moderate multilevel end plate degenerative changes are present predominantly at C4-C6. Neural foramina appear to be patent bilaterally. Pre-vertebra soft tissues are unremarkable.

Impression; Multilevel degenerative disease.

*Antony L. Roberts*

Antony L. Roberts, D.O.     rjy

Read Date: 8/11/2015

*electronically signed*

End of report for: CREECH, SCOTT     A588782

An "*" following the Inmate# indicates a number from a prior incarceration.

*professional radiology services by* **Mid-Ohio Radiology, Inc.**

AGO Response to Discovery Request
000083

# Franklin Medical Center

1990 Harmon Ave., Columbus, OH 43223-0658

(614) 445-5960 Radiology Ext. 2734

**CREECH, SCOTT**     Inmate# A588782     Inst: CCI     Req# 150019541

CERVICAL SPINE     Exam Date# 5/30/2013

TWO VIEWS

Disc spaces are well maintained. Marginal osteophytes arise prominently from C4, C5 and C6. Moderate facet joint disease is also noted. Pre-cervical soft tissues are normal. No fracture is identified.

IMPRESSION; Moderate cervical spondylosis with associated facet joint disease.

Charles H. Muncrief, D.O.     rjy

Read Date: 5/31/2013

*electronically signed*

End of report for: CREECH, SCOTT     A588782

An "*" following the Inmate# indicates a number from a prior incarceration.

*professional radiology services by* **Mid-Ohio Radiology, Inc.**

b 5-13

6/5/2013 12:16:01 PM

Page 1 of 2

AGO Response to Discovery Request
000084

Ohio Department of Rehabilitation and Correction
## Confidential: Inmate Hansen's Disease Symptom Screen

Inmate Number: _588-782_  Inmate Name: _Creech_  Lock: _C1_  Date: _10/20/14_

| Symptom Questions | Yes | No |
|---|---|---|
| Do you have any pale or slightly reddened areas on the skin which have lost feeling? _Hx: Melanoma_ | ☐ | ☑ |
| Do you have any loss of feeling in the hand or feet? _Yes do to Auto accident_ | ☑ | ☐ |

| Have you been incarcerated at any of the following Institutions during the listed periods: | Dates | Yes | No | Verification |
|---|---|---|---|---|
| Corrections Reception Center (CRC) | Jan 2011 to Mar 2011 | ☐ | ☐ | |
| Madison Correctional Institution (MaCI) | Mar 2011 to Jun 2011 | ☐ | ☐ | |
| Chillicothe Correctional Institution (CCI) | Jun 2011 to Oct 2014 | ☐ | ☐ | |
| Franklin Medical Center (FMC) | Oct 2014 to Oct 2014 | ☐ | ☐ | |

If either symptom question is positive AND locations verified to be during potential exposure period, refer to ALP.

| | Date |
|---|---|
| Symptom Screen positive | |
| Incarceration dates verified during exposure period | |
| ALP Assessment | |
| Biopsy | |

Nurse Printed Name: _Denise Dunn_   Nurse Signature: _____

Date: _10/20/14_

AGO Response to Discovery Request
000086

# Health History

Reporter: ☐ Self
☐ Interpreter,
☐ Translator   _Name_

Page 1 of 2

| Marital Status: M | Date of Bir REDACTED | Religion: Christian | Race: W |

Covered By Health Insurance: ☐ NO ☐ YES - Name of Insurer: _____

Family History: (f) father, (m) mother, (s) sister, (b) brother, (g) grandparent, (n/a) not applicable

|  | f | m | s | b | g | n/a |  | f | m | s | b | g | n/a |  | f | m | s | b | g | n/a |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Anemia | ☐ | ☐ | ☐ | ☐ | ☑ | | Epilepsy/Seizures | ☐ | ☐ | ☐ | ☐ | ☑ | | Mental Illness | ☐ | ☐ | ☐ | ☐ | ☐ | ☑ |
| Asthma | ☐ | ☐ | ☐ | ☐ | ☑ | | Heart disease | ☐ | ☑ | ☐ | ☐ | ☐ | | Sickle Cell | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| Cancer | ☑ | ☐ | ☐ | ☐ | ☐ | | Hepatitis | ☐ | ☐ | ☐ | ☐ | ☐ | | T.B. | ☐ | ☐ | ☐ | ☐ | ☑ | ☐ |
| Diabetes | ☐ | ☐ | ☐ | ☐ | ☑ | | Hypertension | ☐ | ☐ | ☐ | ☐ | ☑ | | Other: _____ | | | | | | |

| Next of Kin: REDACTED | Relationship: Mother | Address |  |

REDACTED

Telephone (including area code): REDACTED

| Temp.: 97.1 | Pulse: 82 | Resp.: 14 | Ht w/o eyeglasses: | With eyeglasses: | Allergies: NKDA |
| B/R: 141/003 | Height: 72 | Weight: 185 lbs | Lt w/o eyeglasses: | With eyeglasses: | |

Hearing Impairment: Right Ear ☐ Yes ☐ No   Left Ear ☐ Yes ☐ No
Dental Screening: ☐ Good ☐ Fair ☐ Poor

Personal History (place check in appropriate block at left of each item):

| | Yes | No | | | Yes | No | | | Yes | No | | | Yes | No | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | ☑ | ☐ | Acute skin diseases | 11 | ☐ | ☑ | Diabetes | 20 | ☐ | ☑ | Hernia | 30 | ☑ | ☐ | Skin Infections |
| 2 | ☐ | ☑ | Amputations | 12 | ☑ | ☐ | Ear, nose or | 21 | ☑ | ☐ | High or low blood | 31 | ☑ | ☐ | Stab Wound |
| 3 | ☐ | ☑ | Anemia | | | | throat trouble | | | | pressure | | | | Stomach, liver or |
| 4 | ☑ | ☐ | Arthritis | 13 | ☐ | ☑ | Epilepsy | 22 | ☑ | ☐ | I.V. drug user | 32 | ☑ | ☐ | intestinal trouble |
| 5 | ☐ | ☑ | Asthma | 14 | ☑ | ☐ | Eye disorder | 23 | ☑ | ☐ | Measles | 33 | ☐ | ☐ | Thyroid problems |
| 6 | ☑ | ☐ | Blood transfusion | 15 | ☐ | ☑ | Gun Shot Wound | 24 | ☐ | ☐ | Mumps | | | | Tuberculosis |
| 7 | ☑ | ☐ | Bone, joint or other | 16 | ☐ | ☑ | Heart problems | 25 | ☐ | ☐ | Paralysis | 34 | ☐ | ☐ | positive PPD |
| | | | deformity | 17 | ☐ | ☑ | Hemophiliac or | 26 | ☐ | ☐ | Rheumatic fever | | | | Tumor, growth, |
| 8 | ☐ | ☑ | Cancer | | | | bleeding disorder | 27 | ☐ | ☑ | S.T.D. | 35 | ☐ | ☐ | cyst |
| 9 | ☑ | ☐ | Chicken pox | 18 | ☐ | ☑ | Hemorrhoids | 28 | ☑ | ☐ | Shortness of breath | 36 | ☐ | ☐ | Urinary problems |
| 10 | ☐ | ☑ | Chronic cough | 19 | ☑ | ☐ | Hepatitis | 29 | ☑ | ☐ | Sinusitis | 37 | ☐ | ☐ | HIV/AIDS |

Comments:

14. Double vision s̄ MVA '99

19. Hep C

32. Smoker
↑ Iron in liver
↑TS ↓TSS

| Inmate's Printed Name: Creech Scott | Number: 588782 |

*I have been given information about how to access Medical, Mental Health care, and the Medical Grievance Procedure.*

| Inmate's Signature: X Scott Creech | Number: 588782 |

DRC5031 (REV. 05/07)   White - Medical File   Canary - Dental File   ACA 4343 through 4346, 4376   MEDICAL

AGO Response to Discovery Request
000087

# Health History

Reporter: ☑ Self
☐ Interpretor, _Creech_ Name
☐ Translator

Page 1 of 2

(5J)

| Marital Status: _N_ | Date of Birth: REDACTED | Religion: _Christian_ | Race: _White_ |

Covered By Health Insurance: ☐ NO ☑ YES - Name of Insurer: _M_

Family History: (f) father, (m) mother, (s) sister, (b) brother, (g) grandparent, (n/a) not applicable

| | f | m | s | b | g | n/a | | f | m | s | b | g | n/a | | f | m | s | b | g | n/a |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Anemia | | | | | | ☑ | Epilepsy/Seizures | | | | | | ☑ | Mental Illness | | | | | | |
| Asthma | | | | | | ☑ | Heart disease | ☑ | ☑ | | | | | Sickle Cell | | | | | | |
| Cancer | ☑ | | | | | | Hepatitis | | | | | | | T.B. | | | | | | |
| Diabetes | | | | | | ☑ | Hypertension | | | | | | ☑ | Other: _____ | | | | | | |

| Next of Kin | REDACTED | Relationship: _Mother_ | Address: | REDACTED |
| Telephone (including area code): | REDACTED |

| Temp: _97.7_ | Pulse: _93_ | Resp: _20_ | Rt w/o eyeglasses: _20/50_ | With eyeglasses: _Reading_ | Allergies: |
| BP: _160/114_ | Height: _6'0_ | Weight: _186_ lbs | Lt w/o eyeglasses: _20/50_ | With eyeglasses: _9/1820_ | NKDA |

Hearing Impairment: Right Ear ☑ Yes ☐ No    Left Ear ☑ Yes ☐ No
Dental Screening: ☐ Good ☐ Fair ☑ Poor

## Personal History (place check in appropriate block at left of each item):

| Yes | No | | Yes | No | | Yes | No | | Yes | No | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 ☑ | ☐ | Acute skin diseases | 11 ☐ | ☑ | Diabetes | 20 ☐ | ☑ | Hernia | 30 ☑ | ☐ | Skin Infections |
| 2 ☐ | ☑ | Amputations | 12 ☑ | ☐ | Ear, nose or | 21 ☑ | ☐ | High or low blood | 31 ☑ | ☐ | Stab Wound |
| 3 ☐ | ☑ | Anemia | | | throat trouble | | | pressure | | | Stomach, liver or |
| 4 ☑ | ☐ | Arthritis | 13 ☐ | ☑ | Epilepsy | 22 ☑ | ☐ | I.V. drug user | 32 ☑ | ☐ | intestinal trouble |
| 5 ☐ | ☑ | Asthma | 14 ☑ | ☐ | Eye disorder | 23 ☑ | ☐ | Measles | 33 ☐ | ☑ | Thyroid problems |
| 6 ☑ | ☐ | Blood transfusion | 15 ☐ | ☑ | Gun Shot Wound | 24 ☐ | ☑ | Mumps | | | Tuberculosis |
| 7 ☑ | ☐ | Bone, joint or other | 16 ☑ | ☑ | Heart problems | 25 ☐ | ☑ | Paralysis | 34 ☐ | ☑ | positive PPD |
| | | deformity | 17 ☐ | ☑ | Hemophiliac or | 26 ☐ | ☑ | Rheumatic fever | | | Tumor, growth, |
| 8 ☐ | ☑ | Cancer | | | bleeding disorder | 27 ☐ | ☑ | S.T.D. | 35 ☐ | ☑ | cyst |
| 9 ☑ | ☐ | Chicken pox | 18 ☐ | ☑ | Hemorrhoids | 28 ☑ | ☐ | Shortness of breath | 36 ☐ | ☑ | Urinary problems |
| 10 ☐ | ☑ | Chronic cough | 19 ☑ | ☐ | Hepatitis _about 6 month ago_ | 29 ☑ | ☐ | Sinusitis | 37 ☐ | ☐ | HIV/AIDS |

## Comments:
#1 = _2x MRSA ® groin area healed_
#4 = _all ® side_
#6 = _'99_
#7 = _® shoulder blade_
      _® knee AC "Bad"_
#12 = _HOH ® ear_
#14 = _double vision 2nd MVA_

#31 = _® flank - stone going in from MVA_
#32 = _liver hemachromatosis (Liver)_

| Inmate's Printed Name: _Scott Creech_ | Number: _588782_ |

*I have been given information about how to access Medical, Mental Health care, and the Medical Grievance Procedure.*

| Inmate's Signature: _Scott Creech_ | Number: _588782_ |

DRC5031 (REV. 05/07)    White - Medical File    Canary - Dental File    ACA 4343 through 4346, 4376    MEDICAL

Ohio Department of Rehabilitation and Correction
## Medical Restriction(s) Statement

| Inmate Name: Creech | | Date: 9/21/2015 |
|---|---|---|
| Number: 588782 | Unit: C1 | Time: 1500 |

☐ **Short Term Restrictions** (less than 6 months)
This inmate has the following restriction(s) starting: _____ and ending: _____
                                            Date                             Date

☒ **Long Term Restrictions** (more than 6 months)
This inmate has the following restriction(s) starting: 9/21/2015      9/21/2016
                                                Start Date                    Review Date

☐ **No Restrictions**

*No long-term medical restrictions can be terminated without evaluation by the institution medical provider.*

☒ **Low Bunk**   ☐ ~~Low Range~~

☐ No lifting greater than _____ lbs

☐ No standing longer than _____ minutes

☐ Sit down job (only)

☐ Medical lay-in - _____ days

☐ May attend school, counseling, or other programming

☐ Non-smoking housing required

☐ Other: Cane _____

Chronic AC
Joint Dislocation

| Signature by R.N. until seen by Physician: | | |
|---|---|---|
| Physician Signature: | | Date: 9/22/15 |

DRC 5117 (Rev. 05/04)  DISTRIBUTION:  **WHITE** - Medical Record  **CANARY** - Count Office/Job Coordinator  **PINK** - Unit Staff
*(bottom bunk, bottom range, non smoking housing all other restrictions go to Job Coordinator)*

AGO Response to Discovery Request
000101

# Ohio Department of Rehabilitation and Correction
## Medical Restriction(s) Statement

| | |
|---|---|
| Inmate Name: Creech | Date: 9/6/14 |
| Number: 588782 Unit: C1 | Time: 0815 |

☐ **Short Term Restrictions** (less than 6 months)

This inmate has the following restriction(s) starting: _____ and ending: _____
                                                    Date                                    Date

☒ **Long Term Restrictions** (more than 6 months)
This inmate has the following restriction(s) starting: 9/6/14          9/6/15
                                                      Start Date        Review Date

☐ **No Restrictions**

*No long-term medical restrictions can be terminated without evaluation by the institution medical provider.*

☒ Low Bunk          ☐ Low Range

☐ No lifting greater than_____ lbs          Chronic AC
☐ No standing longer than_____ minutes      Joint Dislocation
☐ Sit-down job (only)
☐ Medical lay-in - _____ days
☐ May attend school, counseling, or other programming
☐ Non-smoking housing required
☒ Other: CANE

| | |
|---|---|
| Signature by R.N. until seen by Physician: | |
| Physician Signature: | Date 9/08/14 |

DRC 5117 (Rev. 05/04)   DISTRIBUTION: **WHITE** - Medical Record   **CANARY** - Count Office/Job Coordinator   **PINK** - Unit Staff
(bottom bunk, bottom range, non smoking housing all other restrictions go to Job Coordinator)

AGO Response to Discovery Request
000102

# Ohio Department of Rehabilitation and Correction
## Medical Restriction(s) Statement

| | | |
|---|---|---|
| Inmate Name: *Creech* | | Date: *2-14-14* |
| Number: *588782* | Unit: *C-1* | Time: *6pm* |

☒ **Short Term Restrictions** (less than 6 months)
This inmate has the following restriction(s) starting: *2-14-14* and ending: *8-14-14*
                                      Date                       Date

☐ **Long Term Restrictions** (more than 6 months)
This inmate has the following restriction(s) starting: _____ _____
                                   Start Date                    Review Date

☐ **No Restrictions**

*No long-term medical restrictions can be terminated without evaluation by the institution medical provider.*

        ☒ **Low Bunk**    ☐ **Low Range**

        ☐ No lifting greater than _____ lbs

        ☐ No standing longer than _____ minutes

        ☐ Sit down job (only)

        ☐ Medical lay-in - _____ days

        ☐ May attend school, counseling, or other programming

        ☐ Non-smoking housing required

        ☐ Other: *Cane* _____

| | |
|---|---|
| R.N. unless seen by Physician: *Stullins, RN* | |
| ~~ure:~~ | Date: *2-14-14* |

(04) DISTRIBUTION: **WHITE** - Medical Record    **CANARY** - Count Office/Job Coordinator    **PINK** - Unit Staff
                           (bottom bunk, bottom range, non smoking housing all other restrictions go to Job Coordinator)

# Ohio Department of Rehabilitation and Correction
## Medical Restriction(s) Statement

| Inmate Name: Creech | | Date: 9-11-13 |
|---|---|---|
| Number: A 588 782 | Unit: C-1 | Time: 1755 |

☑ **Short Term Restrictions** (less than 6 months)
This inmate has the following restriction(s) starting: 9-11-13 (Date) and ending: 3-11-13 (Date)

☐ **Long Term Restrictions** (more than 6 months)
This inmate has the following restriction(s) starting: _____ (Start Date) _____ (Review Date)

☐ **No Restrictions**

*No long-term medical restrictions can be terminated without evaluation by the institution medical provider.*

☑ **Low Bunk**    ☐ **Low Range**

☐ No lifting greater than _____ lbs

☐ No standing longer than _____ minutes

☐ Sit down job (only)

☐ Medical lay-in - _____ days

☐ May attend school, counseling, or other programming

☐ Non-smoking housing required

☑ Other: _Cane_

| Signature by R.N. until seen by Physician: | | |
|---|---|---|
| Physician Signature: | | Date: 9-11-13 |

DRC 5117 (Rev. 05/04)   DISTRIBUTION: **WHITE** - Medical Record   **CANARY** - Count Office/Job Coordinator   **PINK** - Unit Staff
(bottom bunk, bottom range, non smoking housing all other restrictions go to Job Coordinator)

AGO Response to Discovery Request
000104

# Ohio Department of Rehabilitation and Correction
## Medical Restriction(s) Statement

| Inmate Name: Creech | | Date: 10/05/12 |
|---|---|---|
| Number: 588182 | Unit: C-1 | Time: 1130 |

☐ **Short Term Restrictions** (less than 6 months)

This inmate has the following restriction(s) starting: _____ and ending: _____
Date                                                        Date

☒ **Long Term Restrictions** (more than 6 months)
This inmate has the following restriction(s) starting: 10/05/12          10/05/13
Start Date                                    Review Date

☐ **No Restrictions**

*No long-term medical restrictions can be terminated without evaluation by the institution medical provider.*

☒ Low Bunk          ☐ Low Range

☐ No lifting greater than _____ lbs

☐ No standing longer than _____ minutes

☐ Sit down job (only)

☐ Medical lay-in - _____ days

☐ May attend school, counseling, or other programming

☐ Non-smoking housing required

☒ Other: CMC _____

| Signature by R.N. until seen by Physician: | |
|---|---|
| Physician Signature: | Date: 10-9-12 |

DRC 5117 (Rev. 05/04)  DISTRIBUTION:  **WHITE** - Medical Record  **CANARY** - Count Office/Job Coordinator  **PINK** - Unit Staff
*(bottom bunk, bottom range, non smoking housing all other restrictions go to Job Coordinator)*

**AGO Response to Discovery Request**
**000105**

# Ohio Department of Rehabilitation and Correction
## Medical Restriction(s) Statement

| Inmate Name: Creech | Date: 10/4/11 |
|---|---|
| Number: 588 782  Unit: | Time: |

☐ **Short Term Restrictions** (less than 6 months)

This inmate has the following restriction(s) starting: _____ and ending: _____
                                                        Date                                Date

☑ **Long Term Restrictions** (more than 6 months)

This inmate has the following restriction(s) starting: 10/4/11                    10/4/12
                                                       Start Date                  Review Date

☐ **No Restrictions**

*No long-term medical restrictions can be terminated without evaluation by the institution medical provider.*

☑ **Low Bunk**          ☐ **Low Range**

☐ No lifting greater than _____ lbs

☐ No standing longer than _____ minutes

☐ Sit down job (only)

☐ Medical lay-in - _____ days

☐ May attend school, counseling, or other programming

☐ Non-smoking housing required

☑ Other: Wt lifty restriction At upper
ext. to 10 pounds -
-has chronic AC separation
D/C Medical Idle

| Signature by R.N. until seen by Physician: | |
|---|---|
| Physician Signature | Date: 10/4/11 |

DRC 5117 (Rev. 05/04)   DISTRIBUTION   **WHITE** - Medical Record     **CANARY** - Count Office/Job Coordinator     **PINK** - Unit Staff
(bottom bunk, bottom range, non smoking housing all other restrictions go to Job Coordinator)

AGO Response to Discovery Request
000106

# Health Services Request

Petición Para Servicios de Salud

**For Medical Use Only / Para Uso Medico Solamente**

Reviewed by: _Klucherdson R_

Date Received: _9/21/15_    Time Received: _030_    a.m./p.m.

Date Of Request:
Fecha: _9 - 20 - 2015_

Inmate Name:
Nombre: _Creech_

Number:
Numero: _588 782_

Housing Unit:
Unidad: _C-1  160·B_

Request for:    ☒ Medical Care / Attención Medica    ☐ Dental Care / Attención Dental    ☐ Medication Reorder / Reordenar Medicación    ☐ Medication Refill / Rellenar la Medicación

Nature of problem:
Descripción del problema: _Need bottom bunk restriction_
_renewed and new end on my cane._

_Thank-You_
_Scott Creech_
_588 782_

*Place This Slip In Medical Request Box Or Designated Area*
*Ponga en la Caja de Peticiónes Medicas en Area Designada*

DRC 5373 (Rev. 08/07)

AGO Response to Discovery Request
000113

# Traumatic Brain Injury
## Helping You Understand and Cope



For: patient Scott D. Creech
and immediate family / care Takers
From: Grant Medical Center
Staff
Aug. 1999

## ACKNOWLEDGMENT

In our experience with the Grant Trauma Team we have met many families who have touched our lives and taught us many things about Traumatic Brain Injury. In return, it has been our vision to create a book that will be an informative guide for you. We would like to thank all the members of the Trauma Team who have given us input and direction in this project.

Pru Hudson, MA, LSW
Jan Price, RN, BSN
Sandy Ruhe, MA, CCC/SLP
Diann Storey, RN, ADN
Sue VanWoerkom, RN, BSN
Amy Zehala, RN, ADN

# Chapter 1: What is Traumatic Brain Injury?

A traumatic brain injury (TBI) occurs as a result of a blow to the head or penetration by an external force. Either of these can cause the brain to bounce inside the skull, resulting in bleeding, tearing and swelling of brain tissue. Common causes of brain injury include motor vehicle accidents, falls, assaults and gunshot wounds.

When the head is struck, the brain bounces back and forth inside the skull. As a result, the brain tissue can be twisted and stretched causing bleeding, bruising or swelling in the brain.



Figure 2: Multiple injuries to the brain. Injury occurring at point of impact and opposite the point of impact as the brain bounces within the skull.

1



Figure 3: Rotational injury to nerve fibers in the brain result as the brain is twisted within the skull.

*Source: From Jones, Cynthia and Lorman, Janis; Traumatic Brain Injury: A Guide for the Patient and Family. Revised Edition - 1996. Interactive Therapeutics Inc., Stow, OH. Reprinted with permission.*

The damage may be widespread, where all parts of the brain are affected to some degree, or the damage may be limited to a particular area. The more brain damage there is the more the brain will swell, and the damage that results will depend on the nature and amount of force the head received. Further injury to the nerves and brain tissue can occur, as swelling makes pressure inside the brain increase. Areas of bleeding (hemorrhages) can be seen using diagnostic tests such as CT Scan (Computerized Tomography) or MRI (Magnetic Resonance Imaging). Keep in mind that microscopic tears within the nerve fibers caused by

2

twisting and pulling may or may not show up on diagnostic tests, but can still cause significant changes in how the brain works.

Brain injury can also occur as a result of a skull fracture or penetrating injury such as a gunshot wound. Bone or bullet fragments can be pushed into the brain and tear or damage brain tissue and blood vessels.

The brain is very complex and unlike other organs in the body, most often cannot be repaired. Recovery begins as the bleeding stops, the swelling decreases and the damaged brain cells begin to heal. The brain is capable of re-learning some things, but it is important to remember that destroyed brain cells do not replace themselves. Recovery will depend on how severe the brain injury is, the speed and effects of medical treatment, and the overall health of the injured person. Research into TBI is ongoing and many areas are still not clearly understood. In spite of everything we do know, please remember that it can be a very long and difficult road ahead. It is very common for you and your loved one to have good days and bad days.

You may talk to many people and hear many different stories regarding TBI. Please remember that TBIs are very individual and each case may be extremely different from the next, even though the injury may be similar. A TBI is not predictable nor does it follow a specific path. Each patient responds differently to his

3

or her injury.  Often times, we must allow for 1-2 years after the injury to fully  evaluate the extent of the injury and level of potential recovery.

4

## Chapter 2:  The Team Members Involved

During the first few days after admission, you will come in contact with many staff members. This can be confusing at first. Grant Medical Center uses a team approach in treating individuals who have suffered a TBI. This multidisciplinary team consists of physicians, nurses, specialized therapists and other support services. The team members meet frequently to develop and coordinate appropriate treatment and discharge plans.

The primary physicians will be the group of Trauma Physicians. This team consists of the attending physician along with fellows, residents and medical students. The team makes daily rounds and is responsible for all the trauma patients admitted to Grant Medical Center. This team supervises the overall medical care and coordinates referrals to specialty services such as neurosurgery and orthopaedics .

**TEAM MEMBERS**

**Attending Trauma Surgeon:**
There is a group of five Attending Trauma Surgeons. This group of physicians assumes the primary care of your loved one. The attending physician who is on call for the day leads the daily rounds. One of these five

5

physicians is on call 24 hours a day, seven days a week.

**Fellows and Residents:**
These physicians manage the daily care of your loved one and keep the Attending Trauma Surgeons, consultants and other team members aware of your loved ones condition.

**Trauma Nurse Clinician:**
The trauma nurse clinician is responsible for assuring the coordination and implementation of day to day care of the trauma patients. The nurse clinician acts as a link between the patient/family, the physicians, and the therapists. This coordination of care is carried over into discharge planning.

**Nursing:**
The nursing staff plans, implements and evaluates a plan of care that meets each patient's physical, emotional and spiritual needs. The nurses work with the therapists to help the patient gain as much independence as possible within the limits of his or her injury.

**Physical Medicine and Rehabilitation Physician (PM&R):**
Rehabilitation is begun as early in the hospitalization as possible. The PM&R physician will help to evaluate the patient for rehabilitative needs and begin appropriate

6

patient become more independent. S.T. also evaluates swallowing and provides methods that will make swallowing safer and easier.

**Respiratory Therapy:**
The respiratory therapist assists in managing the ventilator for the patient as directed by the physician. They also provide oxygen therapy, breathing treatments and may assist in suctioning secretions.

**Social Worker:**
The social worker assists patients and their families with social problems caused by illness or disability. The social worker is trained to interview patients and family members to assess social, emotional, environmental, economic status, and to explore resources for coping with a patient's illness or injury. The social worker can provide information and assistance in obtaining financial aid and services through community agencies. In addition, the social worker will assist with discharge planning and can provide support and counseling to aid in the patient/family adjustment.

**Dietician:**
The dietician ensures that the patient is receiving adequate nutrition whether by mouth or by tube feedings. Proper nutrition is essential for recovery. The dietician works closely with the speech therapist in assisting patients who have special dietary needs as a result of swallowing difficulties. The dietician also

8

provides teaching on special nutritional needs to the patient and family.

**Psychiatric Liaison:**
The psychiatric liaison worker may be consulted to provide information and emotional support to patients and families who have experienced losses. Psychiatric and/or substance abuse assessment can also be provided for patients who have problems with drugs or alcohol.

**Chaplain Services:**
Being in a hospital is a stressful time for both the patient and their loved ones. The pain and anxiety of a sudden trauma, surgery or medical testing can be over-whelming. Chaplains are available to provide spiritual and emotional support for patients and their loved ones. Their goal is to be present in both the stresses and the celebrations of healing and to help the patient and their loved ones cope and heal. Chaplains are trained in theology and behavioral science, and integrate the two in their ministry with respect for individual expressions of faith.

**Financial Counselors:**
Financial Counselors verify insurance information and personal identification, such as, address, phone number, date of birth, social security number and legal next of kin. They will also assist patients and families in

9

applying for government assistance and financial aid programs.

**Pharmacist:**
A pharmacist usually rounds with the Trauma Team. They frequently review the medication lists to assist the Trauma Team in ensuring appropriate and cost effective medication management.

10

# Chapter 3: Intensive Care and Medical Management

Medical management of your loved one is directed primarily by the trauma physicians who may consult other specialists as they are needed. For example, most patients suffering from a traumatic brain injury (TBI) will have a Neurosurgeon consulted on their case. A Neurosurgeon is a licensed physician who specializes in treatment and surgery of the brain and nervous system. The trauma team works closely with the specialists, nurses, pharmacists, therapists and others, to provide the best and most complete medical care for your loved one.

In the acute care hospital, the primary focus is on medical management (controlling brain swelling, airway and breathing management, nutrition, vital sign abnormalities, etc.). Rehabilitative therapies, such as physical therapy, will be ordered and continued as the medical condition permits. The treatment of TBI is individualized to each case.

## Intensive Care

The Intensive Care Unit can be overwhelming! The following is a brief explanation of some of the equipment and terms that may be used in the care of a TBI patient. (Since every patient is different, your loved

11

one may not experience everything that is listed.)

**Intracranial Pressure Monitor (ICP)** - the ICP is a monitoring device placed in or on the brain to measure pressure inside the skull. The ICP can also be used to draw out small amounts of cerebral spinal fluid to reduce intracranial pressure. In more severe TBI cases, surgery may be needed to try to lower the increased intracranial pressure. Medical measures to lower intracranial pressure may include various drugs or lowering body temperature. In some cases, intracranial pressure may be successfully controlled with medical measures alone.

**Endotracheal Tube (ET tube)** - an endotracheal tube is a small, plastic tube that goes through the nose or mouth and into the windpipe. The ET tube may be needed after a TBI if the patient cannot breathe well enough on his own, or is not awake enough to handle his or her own secretions (mucous). Swelling in the part of the brain that controls breathing can result in the inability to breathe. The endotracheal tube helps put oxygen into the lungs and keeps the airway clear of mucous. The patient will not be able to talk with an endotracheal tube in place.

**Tracheostomy Tube (Trach)** - a tracheostomy is a surgical opening into the windpipe through which a tracheostomy tube is inserted. A tracheostomy is performed when a breathing tube is needed for

12

extended periods of time or when the patient is unable to manage and cough up his own secretions (mucous). The tracheostomy tube reduces irritation to the nose and throat and is more comfortable than an ET tube. The patient will not be able to talk with the first tracheostomy tube that is used. When their medical condition improves, the trach tube may be changed to one that allows them to talk. Either the endotracheal tube or the tracheostomy tube allows your loved one to be suctioned with a small pliable tube (catheter) to help remove mucous from their lungs.

**Ventilator** - the ventilator is a machine that provides oxygen to the patient and helps him breathe. Large, plastic hoses connect the machine to the ET tube or trach. The ventilator moves oxygen and air in and out of the lungs. Changes in ventilator settings are made according to the amount of oxygen and carbon dioxide measured in the blood. The ventilator can deliver a specific number of breaths per minute, delivering the volume of air and oxygen the patient needs. As your loved one recovers, he or she will slowly be weaned from the ventilator and take over the work of breathing on his own.

**Nasogastric Tube (NG), Dobhoff, Percutaneous Endoscopic Gastrostomy Tube (PEG)** - a nasogastric tube (NG) is a small, clear, plastic tube inserted through the nose, which goes down the back of the throat and into the stomach. The NG tube removes stomach

13

contents and air. After your loved one becomes more stable, either the NG tube or a Dobhoff feeding tube can be used to give medications and special feedings for adequate nutrition. The PEG is a more permanent feeding tube inserted directly into the stomach through a small surgical incision. PEG tubes are often inserted after it has been determined that tube feedings will be required for an extended period of time. The PEG tube is more comfortable and less irritating than an NG or Dobhoff tube. Feeding tubes are important to maintain adequate nutrition since swallowing problems are common following a TBI.

**Heart (Cardiovascular) Monitor** - a heart monitor provides a visual and audible record of the patient's heartbeat, blood pressure, oxygen content of the blood and sometimes pressure inside the brain. This monitor looks like a television set and is above the bed. It is attached to the patient with electrodes and wires. Although the monitor is attractive and colorful, it is important not to focus on specific numbers since it is difficult to interpret their meaning without formal medical training.

**Chest Tube Drainage System** - a chest tube is a flexible tube inserted into the chest to drain air, fluid and blood. The chest tube is attached to a drainage system and often to suction. This treatment helps to re-expand a collapsed lung.

14

**Intravenous Line (IV), Central Venous Line (CVC)** - an IV is a small, plastic tube that goes into the vein through a needle. A controlled amount of fluids and medication flow through the IV at a set rate. An IV can be placed in almost any part of the body, but is usually in the arms or legs. A CVC is a larger plastic tube that goes into bigger veins, usually in the neck or chest. A CVC is most commonly used when the patient requires large amounts of IV fluids and/or medications.

**Arterial Lines (A-line)** - an A-line is a catheter or plastic tube placed into an artery, usually in the wrist. A-lines allow the nurse to get blood samples for lab tests and provide continuous blood pressure readings. The A-line keeps the patient from needing a needle stick for every blood sample. Blood gas measurements are often drawn through the A-line, giving the most accurate picture of oxygen levels in the body.

**Pulse Oximeter** - the pulse oximeter is a non-invasive device attached most often to the fingertip, toe, or earlobe and is used to measure oxygen saturation in the blood. This is a less invasive way to determine if the patient is getting enough oxygen to meet the body's needs.

**Foley Catheter** - a foley catheter is a small, rubber tube that goes into the bladder to drain urine. The catheter is connected to a drainage bag which hangs on the side of the bed. Monitoring the amount of urine helps to

15

measure kidney function and to determine the need for fluids or medications.

**Pneumatic Anti-embolic Stockings (PAS - AVI)** - PAS stockings are put on the lower legs. They inflate and deflate automatically to increase blood flow, helping to prevent blood clots. AVI's are placed on the feet and work about in the same way.

**Total Parenteral Nutrition (TPN), Tube Feeds** - Both are methods of feeding which are high in protein and essential nutrients. The type and amount are based on the condition and caloric needs of your loved one. TPN is nutrition that is delivered by IV. Tube feeding is nutrition that is delivered into the gastrointestinal tract via the NG, Dobhoff Tube or PEG.

**Edema** - edema is swelling or an abnormal accumulation of fluids in the body's tissues. It is usually found in the face, arms and legs. Edema can be normal since often times large amounts of IV fluids are given, especially in the early stages of trauma. Edema usually does not cause significant harm. Edema is usually worse in the first few days after injury, and then slowly goes away as the medical condition improves.

**Cerebral Edema-** Swelling in or around the brain.

**CAT Scan (CT)** - the CT Scan is a picture of the brain most commonly used to show areas of bleeding or

16

damage. Abnormal findings may not show up on a CT Scan for up to 24 hours after the injury. Although CT scans are a useful and very important tool, the patient must also be evaluated in terms of the clinical examinations, which may be more important.

**Magnetic Resonance Imaging (MRI)** - an MRI is another picture of the brain less frequently used than the CT Scan. The MRI machine uses magnets. An MRI cannot be done if the patient has certain metals in the body.

**EEG** - an EEG is a test using electrodes attached to the head to measure brain activity. The EEG is usually used to identify areas where seizures may begin.

While in the Intensive Care Unit, your loved one may be receiving a variety of medications. Pain medications, such as Morphine, are used to increase comfort. Sedating and paralyzing drugs may be used to keep your loved one relaxed, thus decreasing the demand for oxygen and allowing the body to rest and heal. Often times other medications may be used to help regulate blood pressure, treat infections or assist normal body functions.

Frequently you will hear monitors alarm in the Intensive Care Unit. Please understand that alarms can often be triggered by simple movements, such as coughing, turning or overstimulation. The staff will pay special

17

attention to monitors that alarm and take care of any problems that arise.

The Intensive Care Unit can be overwhelming and often difficult to understand, especially at times of high stress. Please be aware that the nurses in the Intensive Care Unit care for many critically ill patients and often times visiting restrictions may be placed because of the condition of your loved one or the condition of other patients. In the Intensive Care Unit, visitors need to be kept to a maximum of two at a time and to immediate family members only.

Please feel free to ask questions to any member of the Trauma Team. The nurses and other staff members want to do whatever they can to help you and your loved one through this experience.

18

## Medical Management Part II - Recovery on the Trauma Unit

As your loved one improves and their condition becomes more stable, they will no longer require the intensive care and observation which are available in the Intensive Care Unit (ICU). When the doctors decide that ICU is no longer needed, your loved one will be transferred to the seventh floor Trauma Unit. One area on the unit is designed as a "step-down" area, where there are less nurses per patient than in the ICU, but still more than the regular floor patients. This is called the Trauma Intermediate Care Unit, or TICU. In this area, patients are observed more closely than on the general nursing unit.

When patients continue to improve and require less direct nursing care, they will be moved to the general seventh floor nursing unit. On this unit, nurses care for as many as 6 to 8 patients at a time, often making it seem to families that no one is watching their loved one as closely. Please be assured that these very capable nurses and patient care technicians are concerned about and caring for each individual on the unit. In fact, as part of the healing and recovery phase, it is important for your loved one to assume more responsibility for simple activities of daily living (such as grooming and bathing) which are needed in order to go home safely. The staff works very closely with the therapists and other trauma team members to promote

19

as much independence as possible, within the limits of your loved one's injuries.

When trauma patients are medically stable and no longer require the acute hospital setting, arrangements for after hospital care must be in place. The trauma team and rehabilitation specialists will determine which level of care is most appropriate, the trauma nurse clinician and the social worker will help you and your family to complete all the discharge arrangements.

20

# CHAPTER 4: Cognitive, Behavioral and Physical Changes Following Brain Injury

The brain is the control center for the entire body. Most patients who suffer a TBI will have a combination of problems and each combination is unique to that individual. The most common change is in cognition, or thinking skills. This can include changes in alertness, attention, orientation, memory, problem-solving, reasoning, judgment and insight. There may also be problems in processing information, talking, reading and writing. Behavioral changes may include agitation, confusion, disinhibition (lack of self control), lack of motivation and impulsiveness. Physical impairments can include paralysis or weakness in arms and legs, uncoordinated movements, difficulty with planning movement, decreased sensation, bowel and bladder problems and visual changes.

A swallowing problem may occur with brain injury. Choking or aspiration (food going into the lungs) during eating or drinking can happen if the message from the brain to the throat muscles has been disrupted. There may also be a swallowing problem if the patient is not alert or aware enough to eat or drink. If a swallowing problem is suspected, an evaluation by a speech therapist will be done to avoid serious respiratory and nutritional complications. Suggestions for making

21

swallowing easier and safer can be provided. If the swallowing problem is severe enough, the doctor may choose to withhold eating or drinking by mouth and feed the patient by inserting a tube into the nose that goes into the stomach (NG or Dobhoff tube), or by inserting a tube directly through the abdominal wall and into the stomach (PEG). Tube feeding can be used for as long as needed.

It is important to remember that not all persons with a head injury will experience all these symptoms. Be sure to ask questions so you can understand which problems affect your loved one.

22

# Chapter 5:    Levels of Recovery of Cognitive Functioning

The hospital uses the Rancho Los Amigos Scale to assess the level of cognitive functioning (thinking skills) following a TBI.  The scale consists of eight levels.  People progress through these levels at different rates.  The length of time at any level may vary from days to years.  Divisions between levels are not always well defined and patients may show characteristics from more than one level at a time.  The following are brief descriptions of each level along with suggestions for working with your family member.

## Level I:  No response

The patient appears to be in a deep sleep and is completely unresponsive to any kind of stimulation.  If medically stable,  the physical therapist (P.T.) and occupational therapist (O.T.) may be involved for range of motion exercises to maintain joint flexibility and to help maintain normal muscle function.  The  O.T. may also begin a coma/sensory stimulation program to help increase the level of mental alertness, and may provide recommendations for stimulating awareness with touch, smell  or sound when appropriate.

**Suggestions for families:**

1.    Talk in a normal tone about familiar things such as family and friends.

23

2.        Have only one person talk at a time.

**Level II:  Generalized response**

The patient is in a semicomatose state and will begin to respond in very basic ways such as moving an arm or leg in response to pain. Responses are likely to be slowed. It may be difficult to tell the difference between an involuntary reflex and a true response to a command.

**Suggestions for families:**

1.        Talk in a normal tone about familiar things such as friends and family members.

2.        Turn off the TV or radio when talking. Have only one person talk at this time. (Periods of stimulation should be brief, about 5-15 minutes, as the patient is not capable of processing a lot of information at a time.)

3.        Allow periods of rest. (Continuous stimulation is not needed and can cause unnecessary agitation.)

4.        Introduce yourself every time and each day orient the patient to where he is and what day it is. (This information will not be remembered.)

24

**Level III: Localized response**

The patient is becoming more aware of things and people around him and responds more specifically such as by turning his head toward sound or focusing with his eyes. He may follow simple commands such as "close your eyes" or "make a fist". He may not always recognize family members. His responses still may be very delayed and inconsistent. The therapists will begin to increase his level of activity within the limits of his medical condition. The P.T. will continue range of motion exercises and may begin to work on head control and sitting balance as the medical condition permits. The O.T. will begin to work on functional skills such as grooming. At this level the speech therapist (S.T.) focuses on functional skills such as increasing alertness, following directions and communication.

**Suggestions for families:**

1. Bring in pictures of family, friends and pets.

2. Be careful not to over-stimulate; this can happen quickly. ( A few minutes at a time is all that can be tolerated.)

3. Turn off TV or radio. ( Extra noises can lead to over-stimulation.)

4. Talk in normal voice. Use simple 1-step directions (example: "Squeeze my hand").

25

5.      Allow extra time for a response. (Responses may be very delayed.)

6.      Introduce yourself every time and each day orient the patient to where he is and what day it is.      (This information will not be remembered.)

7.      Give plenty of resting time. Do not talk all the time or ask repeated questions rapidly.

## Level IV: Confused-Agitated

At this stage the patient is very restless or agitated and may behave very strangely. He may attempt to remove restraints and tubes and crawl out of bed. He may strike out and use foul language.  The patient is confused and disorganized and cannot be held responsible for his behavior during this stage. He is not angry with you, although it may seem that way. Attention span is very brief and limited to less than a few minutes.  He may use common objects incorrectly, such as brushing teeth with a comb.  He will not remember new things and may not be able to remember his age and address. The therapists will attempt to decrease the patient's agitation by keeping the environment very structured since patients  will over-stimulate very easily.  Calming medications may be needed.

26

**Suggestions for families:**

1.  Be calm. Do not act in a rough or aggressive way. Do not argue. Turn TV and radio off. Have only 1-2 people visit at a time. (This may help avoid over-stimulation.)

2.  Ignore inappropriate gestures or sexual comments. ( Keep in mind that this is not in their control.)

3.  Introduce yourself every time and each day orient the patient to where he is and what day it is. (This information will not be remembered.

4.  Only talk about the here and now. (Your loved one will not remember recent events and will not have a concept of tomorrow.)

**Level V: Confused- Inappropriate**

The patient appears alert and able to follow simple commands but has difficulty following more complex directions. He may be able to attend to a task for longer periods but will be easily distracted and require frequent redirection. He may be able to do basic tasks such as eating and dressing but is unable to learn new information. He still may not remember where he is, the day, month or year. Memory for recent events is extremely limited. He will not be aware of physical and

27

cognitive problems and may think that he is capable of going home and returning to his previous lifestyle without difficulty. The S.T. continues to work on orientation, attention and processing and begins to work on sequencing and memory. The O.T. will continue to work on activities of daily living and functioning of the arms and hands if needed. The P.T. will work on walking, motor planning, transfers or wheelchair management.

**Suggestions for families:**

1.    Continue to use simple words and short sentences, but don't talk or treat them like a baby.

2.    Correct false statements gently. Do not argue. ( Information processing is still very impaired.)

3.    Each day orient the patient to where he is and what day it is. (This information will not be remembered.)

4.    Go over information about family and friends. Discuss problems the patient is having honestly, accurately and matter-of-factly.

5.    Eliminate distractions. (The patient can become over stimulated easily.)

28

6.      Do not trust the patient's judgment.    (His ability to recognize his own limitations is still very impaired.)

7.      Ignore inappropriate comments.

8.      Give hints that will help your loved one to be able to give the correct answer.   (It is not easy to recall stored information without help.)

**Level VI:  Confused- Appropriate**

The patient follows directions consistently and is becoming oriented to place and time.  He continues to be confused but  responds more appropriately. Memory for recent events is still poor.  Learning new information  is very difficult.  He may also start to become more aware of some of his problems, but is unable to see how these problems may affect him in the future or how to work around these problems.   He will show little insight.   The P.T. will continue to work on physical problems.  The O.T.  will continue to work on developing skills for functioning in the home and community.  The S.T. will focus on increasing attention span, processing more information and improving memory.  New strategies for memory and logic may have to be learned.

29

**Suggestions for families:**

1.     Do not trust the patient's judgment.     (His ability to recognize his own limitations is still very impaired.)

2.     Record daily activities in a notebook and discuss activities already written down.

3.     Continue to keep activities limited.  (Constant activity is too much.)

4.     Continue to be very specific when talking. (Jokes or sarcasm are not understood.)

5.     Encourage the patient to work with all  the different therapies.  (They will not understand their own problems and become easily frustrated.)

**Level VII:  Automatic-Appropriate**

At this stage the patient is now able to remember on a day-to-day basis although he may not be able to give a lot of details.   He continues to have problems concentrating and trouble learning new information. He is able to learn new information but more slowly than normal.   The patient is able to do daily routines automatically, but has very little recollection of  what he has been doing , and has limited insight into the reality

30

of his situation. Judgment continues to be impaired. There is difficulty with problem-solving and he cannot plan realistically for the future. Supervision is required at home for safety reasons. Judgment is too poor to drive a car. The S.T. will continue to work on higher level thinking skills including problem-solving, memory, attention, reasoning and abstract thought. The P.T. will continue to work on physical problems if needed including motor planning and balance. The O.T. will continue to focus on improving function in arms or hands (if needed) and on activities of daily living.

**Suggestions for families:**

1.　　Strongly encourage your loved one to continue with therapies. (He may feel back to normal even though subtle higher level cognitive and physical problems may still exist.)

2.　　Talk in a normal fashion.

3.　　Discuss events of day to help improve memory. Encourage him to write in a memory notebook.

**Level VIII: Purposeful-Appropriate**

Memory for past information is good while recent memory may still be slightly impaired. The patient will have the ability to learn new information although not as

31

quickly as before. He may continue to show problems with logic, intolerance of stress or poor judgment in emergencies or unusual situations. Social, emotional and intellectual abilities may be less than before but are intact enough to function as a member in society.

**Suggestions for families:**

1. Help the person with familiar activities so they can see some of the minor problems present in thinking and problem solving.

2. Encourage note-taking as a way to get around remaining memory problems. (It may be necessary for important facts or instructions to be written down.)

3. Involve him in complex tasks such as meal preparation and initiating activities independently. It may be helpful to develop individual aids, such as schedules and reminder lists, to plan his time. Give them responsibility for specific chores.

**POST CONCUSSION SYNDROME:**

Post Concussion Syndrome (PCS) can occur following a concussion, or a sudden shock or jarring to the brain, with or without loss of consciousness. Frequently diagnostic tests such as CT and MRI may not show

32

any specific damage.  PCS is common and most people recover fully.   Recovery times will vary; three months is a typical duration.   Symptoms can include any of  the following:

| | |
|---|---|
| Headaches | Problems sleeping (Insomnia) |
| Dizziness, nausea | Poor coordination or loss of balance |
| Hearing problems, ringing in ears | Blurred or double vision |
| Loss of sense of smell or taste | Fatigue |
| Seizures | Sensitivity to alcohol |
| Difficulty processing verbal or written information | Feeling dazed |
| Slow response time | Bothered by loud noise, crowds or public places |
| Bothered by bright light | Memory problems |

33

| Difficulty concentrating and keeping organized | Irritable, loses temper easily |
|---|---|
| Feeling anxious, depressed, crying episodes | Decreased motivation and interest in socializing |

Post Concussion Syndrome can interfere with the ability to function at home, work or school. For safety reasons careful 24-hour observation is recommended in situations that require attention or concentration. The patient's ability to function safely may decrease significantly with fatigue. The speech therapist can provide further information and ways to manage problems during the recovery process. If PCS continues to be a problem, a referral may be made to a specialist such as a neuro-psychologist.

34

# Chapter 6:  Preparing for Discharge

It is not uncommon for a person recovering from a TBI to need further therapy after discharge from the hospital.  The physicians, trauma nurse clinicians, therapists and social workers involved will help direct the patient into the most appropriate rehabilitation center or therapy setting after discharge.  Many factors go into this decision including therapy needs, insurance benefits, facility specialization and location, and family wishes.  If the patient is going home, special equipment may be needed.  The social worker will make the arrangements for equipment and continued therapy as needed.

**Inpatient Rehabilitation Center**

An inpatient rehabilitation center may be needed if the patient is medically stable and ready for discharge from the hospital  but still needs intensive daily rehabilitation therapy before returning home.  The rehabilitation facility is similar to the hospital in that the patient will stay overnight and get medical care, however, the main focus will be on comprehensive rehabilitative therapy.  The patient will need to follow commands consistently and be strong enough to tolerate at least 3 hours of therapy a day.  Most inpatient rehabilitation centers require the patient to be at a Rancho Level III or greater.  The goal of rehabilitation is to help the patient

35

return to a more independent lifestyle within the limits of his or her disability. Patients will wear their own clothes and will be challenged in real life daily situations. The social worker will help coordinate the arrangements with a facility. Families are encouraged to tour the facilities that are being considered.

## Skilled Nursing Facility (SNF)

A skilled nursing facility may be recommended if acute care is no longer needed and a short term stay or work on increased endurance is needed. Grant Medical Center's (SNF) is one such facility and is located within the hospital on the fifth floor. Families are encouraged to tour any facilities being considered.

## Extended Care Facility (ECF)

Community extended care facilities can provide more long term care for patients who cannot yet tolerate the demands of in-patient rehabilitation but require 24 hour nursing care after hospital discharge. The social worker will help coordinate arrangements and families are encouraged to tour any facilities being considered.

## Outpatient Therapy

Outpatient therapy may be recommended if continued therapy is needed after discharge but not on a daily basis. Typically therapy is 2-3 times a week for 1 hour sessions at a nearby hospital or clinic. Daily

36

13.    What additional costs will be charged to the family above and beyond the daily rate?

14.    Is special equipment, (wheelchair, walker, cane etc. ) included in the daily rate?

15.    What kind of a community re-entry program is used?

The social worker will make transfer arrangements to the rehabilitation facility. One family member may go along with the patient in the ambulance as well as 2-3 shopping bags of personal belongings. Personal clothing is encouraged at the rehabilitation facility. Since the patient may be working on dressing activities, clothing items should be easy to put on or take off. Family members often have questions about what to bring to the rehabilitation center. Following is a checklist of suggested items.

**Personal Items:**

Dentures
Glasses or contact lenses
Slacks or sweatpants  Blouses/shirts
Night wear
Shoes with non-skid soles
Jacket, sweater or coat
Cosmetics/shaving cream
Shampoo

39

Toothbrush, toothpaste or denture cream
Special equipment currently used
Small change (no more than $5.00) for daily paper etc.
Note: Please place your loved one's name on all
personal items.

**Recommended insurance information:**

Current health insurance card
Name, address, telephone number of employer
New or recent insurance claim forms which need to be
completed
Name, address, telephone number of insurance
company
Insurance policy number and telephone number for
verification of benefits and coverage

40

# Chapter 7: Financial and Legal Considerations

Very soon after your loved one arrives at the hospital you will be contacted by a financial counselor. Insurance companies generally need to be contacted within one business day of hospital admission. This is called notification of an emergency admission. The financial counselors handle this and will help to answer your insurance related questions. Financial counselors are available throughout the hospitalization. The financial counselor also has information about disability insurance, charities and "Victims of Violent Crime" compensation.

In case your loved one does not have insurance, the financial counselor will help you file for public assistance, or make other arrangements to pay for your health care services rendered at the hospital. It is important to do this early in the hospitalization. We cannot arrange transportation, rehabilitation, home therapies, out-patient therapies, nursing care, or medications without insurance or some method of payment. Regardless of your loved one's insurance status, his or her medical care will not be compromised, but it is essential that you work with the hospital financial counselor as needed.

The following are some legal options that may need to be considered to ensure that the patient's affairs are

41

being properly managed in his or her best interest. The social worker is available to answer any of your questions.

**Power of Attorney** (POA) - This is a written, voluntary statement by an individual by which he appoints another person to perform certain financial or other functions. This statement is drawn up by an attorney and may be done in the hospital if the patient is able to make his own decisions about his affairs. The hospital does not have the forms or provide witnesses; you will need to seek advice from your attorney.

A certain type of a power of attorney is a "Durable Power of Attorney for Health Care". With this type of power of attorney, the patient appoints another individual who can represent them in health care decisions if the patient should become unable to make these decisions. A similar document is a "Living Will", in which the individual declares his or her desires and intentions regarding life sustaining treatment in the event of a critical illness or injury. For more information about these forms, please ask your hospital chaplain or social worker.

**Guardianship** - For a guardianship, the patient must be determined to be physically and/or mentally incompetent. The guardian becomes responsible for the affairs of the patient. This typically allows the guardian to make medical decisions and/or manage the

42

patient's affairs. The process of appointing a guardian requires an attorney and a hearing in Probate Court. This is often time consuming and requires the completion of forms by a physician.

**Social Security** - Social Security Income and Social Security Disability are programs that the patient may be eligible for which can provide money to patients if they are over 65 years of age or disabled as determined by a doctor. Information about both of these programs can be obtained through the social security office in the county where the patient lives.

43

*No-44*

## Chapter 8:      Taking Care of You

You need to take care of yourself.   It is important to eat well and get adequate rest.   Once your loved one is out of immediate danger, we encourage you to return to a normal life as much as possible by going home and even returning to work.  Your loved one will need you **even more** when it is time to be discharged from the hospital.  The following are suggestions that you may find helpful and that can help us better serve you.

- Appoint **one** spokesperson (usually the legal next of kin if possible) for the family.  This person should be responsible for day to day contact with the trauma team and for sharing that information with the remaining family members and friends.  Due to the complex nature of most patient's care and the demands placed on those caring for your loved one, we can only work with the designated spokesperson on a routine basis.  Answering calls from various family members takes the trauma team away from caring for your loved one and other seriously injured patients.

- Remember to get adequate rest and nutrition.  If you feel that it is important to have someone stay  in the waiting room at all times, make a schedule and alternate which family and friends will stay.  Visiting hours are limited in the ICU and on most other units.

45

*No - 44*

- Delegate tasks (such as running errands, checking the mail, answering phone messages, etc. ) to friends or other family members. Family and friends want to be helpful during this time so take advantage of their offered assistance.

- Don't be afraid to ask questions! Jot down a list of questions as you think of them. There are many members of the trauma team and someone is always available to answer your questions.

- Keep a journal. Keeping track of progress, visitors, and your feelings can be very helpful.

Find a person (priest, minister, counselor, social worker) to talk to about your feelings and reactions to your loved one's hospitalization. Schedule appointments with this person, taking time to deal with your feelings.

46

# Chapter 9: Frequently Asked Questions

## 1. How long does recovery take?

Recovery time varies and depends on the extent of the injury and the person's general health. Progress in the early stages of recovery is often the best indicator of how well a person will do in later stages. People tend to make the most noticeable progress in the first three to six months. Subtle improvements may continue after one year. There is no "specific time frame". Recovery is very individual and is best evaluated on a day to day basis. Some research suggests that progress can continue for as long as five years.

## 2. Will my loved one ever be the same?

There will never be a guarantee that a full recovery will be made. Factors including age and severity of injury need to be considered. The brain is a very complex organ that is highly susceptible to change following an injury. Subtle changes may affect personality, behavior and thinking. Problems in remembering details may be present for many years. It is difficult in the early stages to predict long term effects.

47

### 3. When will the patient be able to return to work or school?

The ability to return to work or school will depend on the person's level of functioning and the type of previous employment or school setting. Some people have to start gradually back into work or school. Some may be able to go back after a period of recovery. Others may need to change jobs to one that better suits them depending on their limitations. This is often decided during follow-up visits to the trauma clinic or in the rehabilitation setting.

### 4. When will my loved one be able to drive?

A driver's evaluation is highly recommended and often required before driving. Good vision, judgement, coordination, reaction time and attention are necessary for safe driving. Some rehabilitation centers can provide this service.

### 5. How long will the patient be in therapy?

It is difficult to predict the duration of recovery. Average inpatient rehabilitation is 2-4 weeks. Outpatient therapy may last from weeks to several months depending on the severity of injury. Keep in mind that complete recovery may take years.

48

**6. Is my loved one in a coma?**

Level of consciousness is often difficult to understand. Occasionally sedating or pain medications may be required due to the medical condition. A coma can even be induced with medications. A day to day evaluation and clinical examination are the best ways to determine a person's level of consciousness.

**7. Can my loved one hear me? Should I talk to them? What should I say?**

We believe that your loved one can hear you. It is important to talk to them, one person at a time, in a quiet, comforting tone. You may wish to fill them in on everyday activities, reassure them that they are in a safe place and tell them a little about what happened, for example, "You are in the hospital. You hurt your head. You are in a safe place and we are taking care of you." If they are able and ask specific questions, answer them honestly.

**8. When will the patient "wake-up"?**

There is no magical moment of "waking-up" with a TBI patient. Consciousness usually improves very slowly over days, weeks and even months. Please remember that this will be a long road often times requiring in - patient or out-patient therapy.

49

**9. Will the team be ordering more CT Scans or an MRI?**

The physicians will consult with each other as well as with the specialists to determine when further tests are needed. It is important to remember that the most accurate information about your loved ones status is determined by the daily clinical examination and evaluation.

50

# Chapter 10:    Further Resources

In many cases, life is never  the same for the patient and loved ones after a TBI.  Resources and support are available while the patient is in the hospital, however, it seems that  over time and after the patient is home or back into the community, resources seem to lessen. Listed below are some established resources for TBI patients and families.  You may also wish to consult your church or  local support groups.

National Head Injury Foundation, Inc.
333 Turnpike Road
Southboro, MA  01772
1-800-444-NHIF

Ohio Head Injury Association
1335 Dublin Road Suite 50-A
Columbus, Ohio  43215-1000
(614) 481-7100
1-800-686-9563

Columbus Metropolitan Library
Main Library
96 S. Grant Ave.
Columbus, Ohio  43215

51

Living With Head Injury: A Guide For Families
Senelick, Richard C. MD and Ryan, Cathy E.
Rehab Hospital Services Corporation, Washington D.C.,
1991. (Call the National Head Injury Foundation for
ordering information.)

Traumatic Head Injury Causes, Consequences and
Challenge. Swiercinsky, Dennis P. PhD.; Price, Terrie
L., PhD., Leaf, Leif Eric, PhD. The Head Injury
Association of Kansas and Greater Kansas City, Inc.
Kansas City, Missouri, 1987.
(Call the National Head Injury Foundation for ordering
information.)

52

# Glossary and Frequently used Terms

| | |
|---|---|
| **ADL** | Activities of Daily Living (bathing, dressing, etc. ). |
| **AFO** | Ankle-foot orthosis; a short leg brace. |
| **Ambulate** | To walk. |
| **Aphasia** | Total or partial loss of the ability to use words or speech. |
| **Apraxia** | Partial or complete inability to carry out a planned, purposeful sequence of movements in the absence of paralysis. |
| **Arterial line** | A catheter or plastic tube placed in an artery to measure blood pressure. |
| **Aspiration** | A swallowing problem when food, liquid or secretions enter the lungs. |
| **Attention** | The ability to focus on incoming stimulation. |
| **Bilateral** | Both sides of the body. |
| **Brainstem** | Connects the brain with the spinal cord. |
| **Catheter** | A tube for draining urine inserted into the bladder (Foley) or external over the penis (condom). |
| **Cerebellum** | The lower back portion of the brain. |
| **Cerebral edema** | Swelling of the brain or surrounding tissue |

53

| | |
|---|---|
| **Chest tube** | A flexible tube inserted into the chest to drain air, fluid and blood. |
| **Cognition** | Thinking skills. The mental ability to attend to, concentrate on, learn, remember, organize, and process information logically. |
| **Coma** | State of unconsciousness where person appears to be asleep but cannot be aroused to open the eyes, follow simple commands or talk. |
| **Concussion** | A sudden shock or jarring to the brain, which may or may not cause a loss of consciousness. |
| **Confusion** | An inability of the person to make sense of the environment. Confusion may be reflected in agitation, disorganized thought or incorrect memories. |
| **Continence** | Ability to control bowel and bladder functions |
| **Contracture** | Loss of joint motion; stiffness. |
| **Contusion** | A bruise. When occurring on the brain, can cause tissue damage or bleeding. |
| **Craniotomy** | An operation removing a portion of the skull to allow surgical access to brain. |

54

| | |
|---|---|
| **CT scan** | Computerized Tomography. An x-ray test that makes pictures on a computer of the soft and hard tissues of the body. |
| **Decubitus** | A localized breakdown of all skin layers (commonly called bed sore). |
| **Dobhoff** | A tube which is passed through the nose and into the stomach to carry food directly into the stomach. Similar to NG tube but smaller in diameter. |
| **ECG (EKG)** | Electrocardiogram. A testing procedure using electrodes placed on the chest to record the electrical activity of the heart. |
| **Edema** | Swelling caused by extra fluid in the tissues usually found in the face, arms or legs. |
| **EEG** | Electroencephalogram. A testing procedure using electrodes placed on the scalp to record the electrical activity in the brain. |
| **Flaccid** | Lacking muscle tone; flabby. |
| **Frontal Lobe** | The front portion of the brain. |
| **Functional** | That which can be used daily to serve a useful purpose. |
| **Head Injury** | Brain injury as a result of an accident. (TBI) |
| **Hematoma** | A collection of blood in an organ, space or tissue. |

55

| | |
|---|---|
| **Hemiparesis** | Lack of muscle control on one side of body. |
| **Hemorrhage** | The escape of blood from the vessels; bleeding into the delicate brain tissue. |
| **Herniation** | A rupture of tissue into a nearby space due to internal pressure or swelling. |
| **ICP monitor** | Intracranial pressure monitor. A monitoring device inserted through the skull to measure pressures in the brain. |
| **Impulsive** | Rapid movement or decision making without thinking through or using good judgment. |
| **Independent** | Ability to perform an activity consistently and safely, without supervision or assistance. |
| **Infarct** | A tissue area deprived of blood flow. |
| **MRI** | Magnetic Resonance Imaging. A procedure using a magnetic field to create a picture on a computer of the soft and hard tissues of the body. |
| **NG tube** | Nasogastric tube. A tube which is passed through the nose and into the stomach to carry food directly to the stomach. Can also be used to suction stomach contents out of |

56

| | |
|---|---|
| | the body. |
| **NPO** | Medical abbreviation for "nothing by mouth". |
| **Occipital Lobe** | The back portion of the brain. |
| **Orientation** | Accurate awareness of self, other people, time and place. |
| **Parietal Lobe** | The middle top portion of the brain. |
| **PEG** | Percutaneous Endoscopic Gastrostomy, feeding tube that goes directly into the stomach. |
| **Perseveration** | Uncontrolled, involuntary repetition of speech or activity. |
| **Premorbid** | A term to describe the patient's condition before the injury. |
| **Prosthesis** | An artificial device or limb. |
| **Quadraparesis** | Lack of control of arms and legs resulting from an injury to the brain. |
| **ROM** | Range of Motion. The range of movement available in a joint, measured by degrees. |
| **Rehabilitation** | A system of organized treatment that enables an injured person to regain the highest possible degree of mental and physical ability. |
| **Sensation** | Information received by brain through the senses of touch, sight, hearing, smell and taste. |
| **Sling** | A soft support for injured or weakened arms or legs. |

57

| | |
|---|---|
| **Spinal Cord** | The nerve pathways to the body. |
| **Splint** | A metal, plaster or plastic support used to position one or more joints properly to reduce muscle tension, increase ROM and/or allow greater use of the body part. |
| **Temporal Lobe** | The side portion of the brain. |
| **Tracheostomy** | A surgical opening at the front of the throat providing access to the trachea or windpipe. |
| **Trach** | A plastic or metal tube inserted into the tracheostomy to maintain an open airway. |
| **Transfer** | Refers to methods of getting to and from a wheelchair, bed, toilet, etc. |
| **Ventilator** | A respirator or breathing machine. |
| **Void** | To empty the bladder, or urinate. |

58

# REFERENCES

Akron City Hospital, Akron, OH. Picking up the pieces: a guide to head injury for family and friends. [Brochure].

Interative Therapeutics Inc., Stow, OH. (1996) Traumatic brain injury: a guide for the patient and family. [Brochure]. Jones, C & Lorman, J: Authors.

Pitt County Memorial Hospital, Inc. (1984). A comprehensive guide for family management of the head injured patients. [Brochure]. Bennett, W, Gillis, R, McIntyre, K: Authors.

Senelick, R.C., & Ryan, C.E. (1991). Living with head injury: a guide for families. Washington, D.C.: Rehab Hospital Services Corporation.

Swiercinsky, D.P., Price, T.L., Leaf, L.E. (1993). Traumatic head injury: cause, consequence, and challange. Kansas City, MO: The Head Injury Association of Kansas and Greater Kansas City, Inc.

59

contemplated by the rule. Nor are requests seeking legal conclusions appropriate when proceeding under Rule 36." *United States v. Petroff-Kline*, 557 F.3d 285, 293 (6th Cir. 2009).

> **Response: ADMIT.**

7. Admit that the Defendants, by taking Plaintiff's mobility device, violated the A.D.A. and Plaintiff's rights thereunder.

**Objection:** "Requests for admissions are not a general discovery device." *Misco, Inc. v. U.S. Steel Corp.*, 784 F.2d 198, 205 (6th Cir. 1986). Rule 36's "proper use is as a means of avoiding the necessity of proving issues which the requesting party will doubtless be able to prove." *Khami v. Ortho-McNeil-Janssen Pharm., Inc.*, 2011 WL 996781 at *2 (E.D. Mich. 2011) (citing *Misco*, 784 F.2d at 205). Therefore, "[r]equests for admission may relate to [facts and] the application of law to fact. Such requests should not be confused with pure requests for opinions of law, which are not contemplated by the rule. Nor are requests seeking legal conclusions appropriate when proceeding under Rule 36." *United States v. Petroff-Kline*, 557 F.3d 285, 293 (6th Cir. 2009).

> **Response:    To the extent the request for admission is permissible, Defendant's DENY.**

Respectfully submitted,

DAVE YOST
Ohio Attorney General

*s/Thomas E. Madden*
THOMAS E. MADDEN (0077069)
Senior Assistant Attorney General
Criminal Justice Section
Corrections Litigation Unit
150 East Gay Street, 16th Floor
Columbus, Ohio 43215-6001
(614) 644-7233; Fax: (866) 239-5489
thomas.madden@ohioattorneygeneral.gov

*Counsel for Defendants*

5

*Hand delivered by*
*Senior Attorney General*
*Thomas Madden*
*on 8-Nov-2018*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

SCOTT DAVID CREECH,                          :

      Plaintiff,                                    :       Case No. 2:19-cv-00104

                                                       :       Judge James L. Graham

      v.                                            :

                                                       :       Magistrate Judge Chelsey M. Vascura

OHIO DEPARTMENT OF                           :
REHABILITATION AND CORRECTION,       :
et al.,                                          :

                                                       :

      Defendants.                                   :

**RESPONSES TO PLAINTIFF'S
REQUEST FOR ADMISSIONS TO THE DEFENDANTS**

1.  Defendants object to the discovery requests to the extent they require disclosure of information beyond the permissible scope of discovery required under the Federal Rules of Civil Procedure. Defendants' responses and any identification of documents included in said responses shall not waive or prejudice any objection Defendant may later assert, including but not limited to, objections to the admissibility of any of the answers or responses hereto, or to the admissibility of documents or categories of documents at trial.

2.  Defendants object to each request and part thereof to the extent that they call for the production of documents or information protected by: (a) the attorney-client privilege; (b) the attorney work product doctrine; (c) any privilege relating to confidential information or confidential communications; (d) the right of privacy; or (e) any other privilege. Any inadvertent identification or production of documents subject to such privilege shall not waive those privileges.

3.  Defendants object to those discovery requests that are vague, ambiguous, unlimited in time, scope or subject, overly broad, unduly burdensome, oppressive, or call for unbounded discovery.

4.  Defendants object to the discovery request to the extent they are not relevant to the subject matter of this action or reasonably calculated to lead to the discovery of admissible evidence.

5.  Defendants do not waive any objection to the admissibility, competency, relevancy, materiality, confidentiality or privilege attaching to any document, communication or information, supplied, nor to the right to object to additional discovery relating to the subject matter of these discovery requests.

1

*Exhibit - B*
*6 pages*

6. Defendants expressly reserve the right to amend and/or supplement these responses and objections with respect to any additional information, material and document requested or obtained in the course of discovery herein.

7. Defendants object to the discovery requests to the extent they request that Defendants produce information in the possession and control of individuals or entities over which Defendants have no right of control. The following responses are made on behalf of Defendants and not on behalf of any other persons or entities.

8. Defendants object to all discovery requests that call for the identification of specific documents responsive thereto as such task is unduly burdensome.

9. Defendants reserve the right to object to any additional discovery procedures initiated by Plaintiff and/or to file a Motion for Protective Order to the extent that any such subsequent discovery proceedings involve the subject matter or substantially the same areas of inquiry covered by these discovery requests.

10. Defendants reserve the right to add to, subtract from, or clarify any objections or responses which are given in response to the discovery requests. Defendants further note that investigation of the areas of inquiry touched upon by the discovery requests shall continue through the time of trial, all of which may necessitate further action as described above.

11. Defendants object to all discovery requests that are objectionable as to form.

12. Defendants object to the discovery requests to the extent that they purport to call for information not known to Defendants and that is not reasonably ascertainable by Defendants.

13. Defendants object to the discovery requests to the extent that they are overly broad, unduly and unreasonably burdensome and oppressive in that the burden of obtaining the information purportedly called for substantially outweighs any probative value of such information.

14. Defendants object to the discovery requests to the extent that they purport to call for answers that are dependent in whole or in part on information to be obtained by Plaintiff from Defendants or another person in the course of discovery.

15. Defendants object to each of the discovery requests to the extent such are not reasonably limited in scope and time.

16. Defendants object to each discovery request that seeks the production of documents or information that is confidential, proprietary, financially sensitive, or of a confidential nature that outweighs any arguable relevance the information could have to this proceeding.

17. All of the foregoing general objections and reservations are incorporated into each of the following responses to Plaintiff's discovery requests whether or not any specific general objection or reservation is referenced therein.

2

## RESPONSES

1. Admit that Plaintiff has a permanent and/or qualifying disability under the A.D.A.'s standards.

**Objection:** "Requests for admissions are not a general discovery device." *Misco, Inc. v. U.S. Steel Corp.*, 784 F.2d 198, 205 (6th Cir. 1986). Rule 36's "proper use is as a means of avoiding the necessity of proving issues which the requesting party will doubtless be able to prove." *Khami v. Ortho-McNeil-Janssen Pharm., Inc.*, 2011 WL 996781 at *2 (E.D. Mich. 2011) (citing *Misco*, 784 F.2d at 205). Therefore, "[r]equests for admission may relate to [facts and] the application of law to fact. Such requests should not be confused with pure requests for opinions of law, which are not contemplated by the rule. Nor are requests seeking legal conclusions appropriate when proceeding under Rule 36." *United States v. Petroff-Kline*, 557 F.3d 285, 293 (6th Cir. 2009).

> **Response:   To the extent the request for admission is permissible, Defendant's DENY.**

2. Admit that the Defendant's medical records reflected multiple instances referencing Plaintiff's disabilities associated with a severe motorcycle accident.

**Objection:** "Requests for admissions are not a general discovery device." *Misco, Inc. v. U.S. Steel Corp.*, 784 F.2d 198, 205 (6th Cir. 1986). Rule 36's "proper use is as a means of avoiding the necessity of proving issues which the requesting party will doubtless be able to prove." *Khami v. Ortho-McNeil-Janssen Pharm., Inc.*, 2011 WL 996781 at *2 (E.D. Mich. 2011) (citing *Misco*, 784 F.2d at 205). Therefore, "[r]equests for admission may relate to [facts and] the application of law to fact. Such requests should not be confused with pure requests for opinions of law, which are not contemplated by the rule. Nor are requests seeking legal conclusions appropriate when proceeding under Rule 36." *United States v. Petroff-Kline*, 557 F.3d 285, 293 (6th Cir. 2009).

> **Response: To the extent the request for admission is permissible, Defendant's DENY.**

3. Admit that Defendants issued the Plaintiff a qualifying mobility device (i.e. cane) – through medical service – starting shortly after Plaintiff's arrival at C.C.I.

**Objection:** "Requests for admissions are not a general discovery device." *Misco, Inc. v. U.S. Steel Corp.*, 784 F.2d 198, 205 (6th Cir. 1986). Rule 36's "proper use is as a means of avoiding the necessity of proving issues which the requesting party will doubtless be able to prove." *Khami v. Ortho-McNeil-Janssen Pharm., Inc.*, 2011 WL 996781 at *2 (E.D. Mich. 2011) (citing *Misco*, 784 F.2d at 205). Therefore, "[r]equests for admission may relate to [facts and] the application of law to fact. Such requests should not be confused with pure requests for opinions of law, which are not contemplated by the rule. Nor are requests seeking legal conclusions appropriate when proceeding under Rule 36." *United States v. Petroff-Kline*, 557 F.3d 285, 293 (6th Cir. 2009).

3

**Response: To the extent the request for admission is permissible, Defendant's DENY.**

4. Admit that the Defendants' – through medical services – continue to reissue said mobility device up until 8/23/16 when the Defendants determine[d] that due to Plaintiff's ability to walk with a swift gait he had no disability.

**Objection:** "Requests for admissions are not a general discovery device." *Misco, Inc. v. U.S. Steel Corp.*, 784 F.2d 198, 205 (6th Cir. 1986). Rule 36's "proper use is as a means of avoiding the necessity of proving issues which the requesting party will doubtless be able to prove." *Khami v. Ortho-McNeil-Janssen Pharm., Inc.*, 2011 WL 996781 at *2 (E.D. Mich. 2011) (citing *Misco*, 784 F.2d at 205). Therefore, "[r]equests for admission may relate to [facts and] the application of law to fact. Such requests should not be confused with pure requests for opinions of law, which are not contemplated by the rule. Nor are requests seeking legal conclusions appropriate when proceeding under Rule 36." *United States v. Petroff-Kline*, 557 F.3d 285, 293 (6th Cir. 2009).

**Response: ADMIT.**

5. Admit that the Defendants on 8/23/16 violated the A.D.A. provisions by arbitrarily depriving the Plaintiff the use of his mobility device, when Plaintiff's medical records indicated the need for such due to a permanent disability.

**Objection:** "Requests for admissions are not a general discovery device." *Misco, Inc. v. U.S. Steel Corp.*, 784 F.2d 198, 205 (6th Cir. 1986). Rule 36's "proper use is as a means of avoiding the necessity of proving issues which the requesting party will doubtless be able to prove." *Khami v. Ortho-McNeil-Janssen Pharm., Inc.*, 2011 WL 996781 at *2 (E.D. Mich. 2011) (citing *Misco*, 784 F.2d at 205). Therefore, "[r]equests for admission may relate to [facts and] the application of law to fact. Such requests should not be confused with pure requests for opinions of law, which are not contemplated by the rule. Nor are requests seeking legal conclusions appropriate when proceeding under Rule 36." *United States v. Petroff-Kline*, 557 F.3d 285, 293 (6th Cir. 2009).

**Response: To the extent the request for admission is permissible, Defendant's DENY.**

6. Admit that the Defendants after examining Plaintiff's medical records and during a recent medical examination on 9/19/19 determine[d] that Plaintiff required a mobility device and reissued Plaintiff a cane on or about that date.

**Objection:** "Requests for admissions are not a general discovery device." *Misco, Inc. v. U.S. Steel Corp.*, 784 F.2d 198, 205 (6th Cir. 1986). Rule 36's "proper use is as a means of avoiding the necessity of proving issues which the requesting party will doubtless be able to prove." *Khami v. Ortho-McNeil-Janssen Pharm., Inc.*, 2011 WL 996781 at *2 (E.D. Mich. 2011) (citing *Misco*, 784 F.2d at 205). Therefore, "[r]equests for admission may relate to [facts and] the application of law to fact. Such requests should not be confused with pure requests for opinions of law, which are not

contemplated by the rule. Nor are requests seeking legal conclusions appropriate when proceeding under Rule 36." *United States v. Petroff-Kline*, 557 F.3d 285, 293 (6th Cir. 2009).

> **Response: ADMIT.**

7. Admit that the Defendants, by taking Plaintiff's mobility device, violated the A.D.A. and Plaintiff's rights thereunder.

**Objection:** "Requests for admissions are not a general discovery device." *Misco, Inc. v. U.S. Steel Corp.*, 784 F.2d 198, 205 (6th Cir. 1986). Rule 36's "proper use is as a means of avoiding the necessity of proving issues which the requesting party will doubtless be able to prove." *Khami v. Ortho-McNeil-Janssen Pharm., Inc.*, 2011 WL 996781 at *2 (E.D. Mich. 2011) (citing *Misco*, 784 F.2d at 205). Therefore, "[r]equests for admission may relate to [facts and] the application of law to fact. Such requests should not be confused with pure requests for opinions of law, which are not contemplated by the rule. Nor are requests seeking legal conclusions appropriate when proceeding under Rule 36." *United States v. Petroff-Kline*, 557 F.3d 285, 293 (6th Cir. 2009).

> **Response:** **To the extent the request for admission is permissible, Defendant's DENY.**

Respectfully submitted,

DAVE YOST
Ohio Attorney General

*s/Thomas E. Madden*
THOMAS E. MADDEN (0077069)
Senior Assistant Attorney General
Criminal Justice Section
Corrections Litigation Unit
150 East Gay Street, 16th Floor
Columbus, Ohio 43215-6001
(614) 644-7233; Fax: (866) 239-5489
thomas.madden@ohioattorneygeneral.gov

*Counsel for Defendants*

As to Objections,

THOMAS E. MADDEN (0077069)
Assistant Attorney General

## VERIFICATION

I, Sonya Peppers, swear or affirm that the Responses to Plaintiff's Request for

Admissions to Defendants, are true and accurate.

Sonya Peppers, MD
CCI CMO

STATE OF OHIO          )
                          )   SS:

COUNTY OF ROSS     )

Sworn to and signed before me this _____ day of November, 2019.

Notary Public
My Commission Expires:

## CERTIFICATE OF SERVICE

I certify that the foregoing *Responses to Plaintiff's Request for Admissions to Defendants,*

was hand delivered on November 8, 2019 by regular, first-class mail to Scott David Creech,

#A588-782, Chillicothe Correctional Institution, P. O. Box 5500, Chillicothe, OH 45601.

THOMAS E. MADDEN
Assistant Attorney General

6

The United States District Court of Ohio
Southern District — Eastern Division

Scott David Creech
    Plaintiff

V.

Ohio Department Of
Rehabilitation And
Corrections, et.al.,
    Defendant

Case No. 2:19-cv-00104

Judge
   James L. Graham

Magistrate
   Chelsey M. Vascura

Exhibit - C
9 pages Total

Declaration of Scott David Creech #588-782
I declare that my over-all health has
greatly disminished and that I suffered
pain (severe pain on many occasions)
in-part due to my mobility aid being
taken by an employee/agent of Ohio
Department of Rehabilitation and Corrections.
As a result of my mobility aid (cane)
being taken for approximately (3) years
I could not get-out and mobilize as I
had been able to before my mobility
aid was taken. This was especially true
during in-climate weather. I had
several bad falls in inclimate weather
which could have possibly been ad-

1 of 3

voided if I'd had a mobility aid
to assist in maintaining my balance.

Plaintiff's mobility aid being taken
has greatly limited his activities in
many ways compared to other inmates.
For instance — his abilities to go to
chow, rec, exercise, going to the
library (law library) etc. Again this
is especially true in inclimate weather
when it's slick outside.

Plaintiff's diseases and old injuries
were both greatly exasperated by the
removal of his mobility aid which
caused severe pain and suffering on
many occasions. This pain and suffering
was extended and/or exasperated
because of no mobility aid to assist
and/or disminish the pressure to the
area's that were causing said pain.

Plaintiff has hand written notes/records
of some of these incidents/episodes,
when and where they occured, names
of witnesse's and location of camera's
that would have film footage of
these events.

However many of the witnesse's
don't want to come forward for fear

of retaliation by the defendant against them.

Some have been transferred since these events occured.

Some (as can be seen) have made statements, and are willing to testify - if need be.

Plaintiff has many disabilities that the defendant has repeatedly tryed to ignore.

These disabilities greatly hamper the plaintiff's ability to act in his own behalf which is causing prejudical harm and or bias to the plaintiff's case.

I declare under the penalty of perjury that the foregoing is true and correct. Executed at Chillicothe, Ohio on 12 July 2020.

Scott David Creech

signature

The United States District Court Of Ohio
Southern District - Eastern Division

| | |
|---|---|
| Scott David Creech<br>Plaintiff<br><br>V,<br><br>Ohio Department Of<br>Rehabilitations And<br>Corrections, et.al,<br>Defendant | Case No. 2:19-cv-00104<br><br>Judge<br>James L. Graham<br><br>Majistrate<br>Chelsey M. Vascura |

## Declaration Of Steven Angel #744-470

I was here at Chillicothe Correctional Institution with the plaintiff Scott David Creech (herein Scott) years ago when Scott had a mobility aid (ie Cane) for assistance in walking and/or maintaining his balance. We (myself, Scott, and others) would walk almost everyday 3 to 5 miles or more. Always a minimum of 2 miles a day with very few exceptions. Scott on a (rare occasion) would be in to much pain and miss a day of walking. Scott had a very bad accident around 1999 or 2000 which greatly limits what exercise's he can do to try to maintain his health. Scott was determined to maintain his health as much as possible by walking as much as he possibly could. Before Scott's cane

1 of 3

(mobility aid) was taken, Scott would always try to speed-walk a mile or more each day. Sometimes after Scott would (get-the-bugs-out) so-to-speak, he was hard to keep up with. I'd say – (look out he's in cane drive). Sometimes it seemed as-though Scott didn't really need the cane – but then something would happen that would cause Scott to loose balance or have sharp paralizing pain and he'd definitely need his cane during those episodes and/or afterwards til whatever the cause – ended. Sometimes Scott (before his cane was taken) would on rare occasions would have sharp paralizing pain that would stop him in his tracks. He use his cane to maintain his balance and/or to hobble somewhere to sit down or hold on to something til the pain subsided to the point he could continue on walking or sometimes he'd just hobble back to his unit to lay down. Sometimes he'd not come back out for days. Especially after his cane had been taken.

    I was released. I caught another case and returned here to C.C.I. in July of 2019. I immediately noticed that

Scott did not have his cane, and he looked terrible compared to his condition before I was released. I asked Scott what had happened to him. Scott explained his condition was a direct result of his mobility aid (cane) being taken. That him being without his cane (when needed) had cause severe aggravation of old injuries which greatly limited his abilities to exercise (walk) as he had before To maintain his health, and as a result he'd put on weight and was out of shape compared to before. Scott said he'd almost stopped trying to walk all together, after several bad falls.

Scott's cane was reissued in the fall of 2019. Scott immediately started to try to walk with us on a daily basis. Scott's health wasn't improving a whole lot — but it wasn't getting any worse (as it had been when he was without a mobility aid.

I have never seen Scott without his mobility aid out-side at any-time when such was available to him.

I declare under the penalty of perjury that the foregoing is true and correct. Executed at Chillicothe, Ohio on 13 July 2020 by—

Steven Gingol
Signature

The United States District Court Of Ohio
Southern District - Eastern Division

| | |
|---|---|
| Scott David Creech<br>Plaintiff | Case No. 2:19-cv-00104 |
| v. | Judge<br>James L. Graham |
| Ohio Department Of<br>Rehabilitation And<br>Corrections, et. al.,<br>Defendant | Majistrate<br>Chelsey M. Vascura |

Declaration Of - Edward York #746-667

I have walked on the rec-yard at Chillicothe Correctional Institution with friends Steven Angel and Scott Creech. I have witnessed Scott have pains and Trouble Trying To maintain balance. I have also witnessed Scott have to hobble somewhere to hold-on to or sit down til the pain in his back and left leg would subside enough for him to continue again. Some times we'd continue to walk, However sometimes Scott would hobble back to his unit and not be seen for days. Scott and Steve Angel frequently talked about how much they used to walk when Scott had a mobility aid (ie (ane) to assist him. When I first met Scott he was usually

1 of 2

walking twice a day - noon and evenings.
However Scott had a few bad episode's
where he was caught outside in The rain
and was in to much pain to go seek shelter.
As time went on Scott came out less and
less til he got his cane back in the
fall of 2019. Since then Scott has been
determined to Try to get his health
back to where it was before his cane
was taken.

I have not seen much improvement in
Scott's health really. But he does on
a daily basis try to get his health
back, or he did at least til we
where locked-down because of The
Covid-19 virus. We have limited
rec-time now. When I do go out
I see Scott usually on the rec-yard
walking.

I have never seen Scott without his
cane since I've known him to have
a cane.

I Edward York declare under the
penalty of perjury that the foregoing is
true and correct. Executed at Chillicothe,
Ohio on 12 July 2020 by —

Ed F York
signature

2 of 2

The United States District Court Of Ohio
Southern District – Eastern Division

| | |
|---|---|
| Scott David Creech | Case No. 2:19-cv-00104 |
| Plaintiff | |
| v. | Judge |
| | James L. Graham |
| Ohio Department Of | |
| Rehabilitation And | Majistrate |
| Corrections, et.al., | Chelsay M. Vascura |
| Defendant | |

Declaration Of
Ellery Gethers #280-851

In the summer month of July of 2019 one
evening while sitting on my locker box at my
bunk on the 3rd aisle of C-1 facing the
aisle-way, Scott Creech fell in the aisle
right in front of me. It happen so quick.
Another inmate helped Scott up. Scott limped
away. Later Scott asked if I'd be a witness
in the event the incident couldn't be pulled-up
on the camera it happened in front of.

I agreed I'd testify if needed. Scott
made a written record of what happen,
when and where. I declare under the
penalty of perjury that the foregoing is true and
correct. Executed at Chillicothe, Ohio on 22 June 2020
by Ellery Gethers ___Gethers 280 851___
        signature

1

