**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **SCOTT DAVID CREECH,** | : | |
| | : | |
| **Plaintiff,** | : | **Case No. 2:19-cv-0104** |
| | : | |
| **v.** | : | **Judge James L. Graham** |
| | : | |
| | : | **Magistrate Judge Chelsey M. Vascura** |
| **OHIO DEPARTMENT OF** | : | |
| **REHABILITATION** | : | |
| **& CORRECTIONS, et al.,** | : | |
| | : | |
| **Defendants,** | : | |

---

## DEFENDANT OHIO DEPARTMENT OF REHABILITATION AND CORRECTION'S OPPOSITION TO SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT

---

Defendant Ohio Department of Rehabilitation and Correction (ODRC) opposes Plaintiff David Scott Creech's Motion for Summary Judgment and moves this Court, pursuant to Federal Rule of Civil Procedure 56, for an order granting summary judgment in its favor. The grounds for this opposition and motion are set forth more fully in the attached memorandum.

Respectfully submitted,

DAVE YOST (0056290)
Ohio Attorney General

*/s/ Thomas E. Madden*

THOMAS E. MADDEN (0077069)
*\*Lead and Trial Attorney*
MARGARET S. MOORE (0096813)
Assistant Attorneys General
Criminal Justice Section
150 East Gay Street – 16th Floor
Columbus, Ohio 43215
Tel: (614) 995-3234\Fax: (866) 239-5489
Thomas.madden@ohioattorneygeneral.gov
Margaret.moore@ohioattorneygeneral.gov
*Counsel for Defendant*

## <u>TABLE OF CONTENTS</u>

PAGE

TABLE OF AUTHORITIES ................................................................................................ ii

MEMORANDUM .............................................................................................................1

I.      INTRODUCTION .................................................................................................1

II.     PROCEDURAL  HISTORY...................................................................................1

        1.  Complaint.................................................................................................1

        2.  Facts .......................................................................................................2

III.    Opposition to Summary Judgment.....................................................................5

IV.    CROSS-MOTION FOR SUMMARY JUDGMENT ........................................9

V.     ARGUMENT

        1.      Claims against the Ohio Department of Rehabilitation and Correction (ODRC) are barred by Eleventh Amendment Immunity...................................................12

        2.      The evidence clearly refutes Plaintiff's argument that he was discriminated against based on his "disability." ..........................................................................23

        3.  Creech's claim is time barred by the statute of limitations..........................................26

VI.    CONCLUSION....................................................................................................28

CERTIFICATE OF SERVICE ..........................................................................................28

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ability Ctr. of Greater Toledo v. City of Sandusky,*
  385 F.3d 901 (6th Cir. 2004) ............................................................7, 23

*Alden v. Maine,*
  527 U.S. 706 (1999)................................................................................12

*Allen v. Cooper,*
  140 S.Ct. 994 (2020).................................................................12, 13, 14

*Anderson v. City of Blue Ash,*
  798 F.3d 338 (6th Cir. 2015) ................................................................15

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986)......................................................................5, 9, 10

*Arnett v. Webster,*
  658 F.3d 742 (7th Cir. 2011) ................................................................20

*Baker v. Bryant & Stratton Coll.,*
  2018 U.S. App. LEXIS 24973 ...............................................................27

*Baker v. McCollan,*
  443 U.S. 137 (1979)...............................................................................17

*Bd. of Trustees of the Univ. of Alabama v. Garrett,*
  531 U.S. 356 (2001)........................................................................ *passim*

*Bell v. Maryland,*
  378 U.S. 326 (1964)...............................................................................16

*Celotex Corp v. Catrett,*
  417 U.S. 317 (1986).........................................................................6, 10

*Chapman v. Houston Welfare Rights Organization,*
  441 U.S. 600 (1979)...............................................................................16

*Chappell v. City of Cleveland,*
  585 F.3d 901 (6th Cir. 2009) ................................................................11

*City of Boerne v. Flores,*
  521 U.S. 507 (1997)..........................................................13, 15, 21, 22

*Cleveland v. Policy Mgmt. Sys. Corp.,*
  526 U.S. 795 (1999)...........................................................................7, 24

*Collins v. City of Harker Heights*,
   503 U.S. 115 (1992)..........................................................................................17

*Comstock v. McCrary*,
   273 F.3d 693 (6th Cir. 2001) ...........................................................................20

*D'Ambrosio v. Marino*,
   747 F.3d 378 (6th Cir. 2014) .....................................................................27, 28

*Daniels v. Williams*,
   474 U.S. 327 (1986).........................................................................................17

*Dearing v. Mahalman*,
   No. 1:11-cv-204, 2013 U.S. Dist. LEXIS 188064 (S.D. Ohio Oct. 7, 2013) ..............5, 6, 9, 10

*Dillery v. City of Sandusky*,
   398 F.3d 562 (6th Cir. 2005) ...................................................................8, 24, 25

*Doe v. Jackson Local Sch. Dist.*,
   954 F.3d 925 (6th Cir. 2020) ...........................................................................17

*Drake v. City of Detroit, Mich.*,
   266 F. App'x 444 (6th Cir. 2008) ....................................................................26

*Edelman v. Jordan*,
   415 U.S. 651 (1974).........................................................................................12

*Endres v. Ne. Ohio Med. Univ.*,
   938 F.3d 281 (6th Cir 2019) ............................................................................27

*Graham ex rel. Estate of Graham v. Cnty. of Washtenaw*,
   358 F.3d 377 (6th Cir. 2004) ...........................................................................20

*Estelle v. Gamble*,
   429 U.S. 97 (1976)...........................................................................................19

*Fed. Mar. Comm'n v. South Carolina State Ports Auth.*,
   535 U.S. 743 (2002).........................................................................................12

*Florida Prepaid Postsecondary Educ. Expense Bd. v. College Savings Bank*,
   527 U.S. 627 (1999).........................................................................................21

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*,
   537 F.3d 667 (D.C. Cir. 2008) .........................................................................19

*Helling v. McKinney*,
   509 U.S. 25 (1993).....................................................................................18, 19

*Hoover v. Langston Equip. Assocs.*,
     958 F.2d 742 (6th Cir. 1992) .......................................................................26

*Hoxie v. Ohio State Med. Bd.*,
     2006-Ohio-646 ...............................................................................................2

*Hurd v. Hodge*,
     334 U.S. 24 (1948) .......................................................................................16

*Johnson v. Hardin County*,
     908 F.2d 1280, 1990 U.S. App. LEXIS 12163 .............................................8

*Johnson v. Nino*,
     48 F. App'x 514 (6th Cir. 2002) ..................................................................20

*Jones v. City of Monroe*,
     341 F.3d 474 (6th Cir. 2003) .......................................................................25

*June Med. Servs. L.L.C. v. Russo*,
     140 S. Ct. 2103 (2020) .................................................................................18

*Kimel v. Florida Bd. of Regents*,
     528 U.S. 62 (2000) ...........................................................................15, 22, 23

*Leary v. Livingston*,
     528 F.3d 438 (6th Cir. 2008) .......................................................................22

*Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp.*,
     475 U.S. 574 (1986).................................................................................6, 10

*McCormick v. Miami Univ.*,
     693 F.3d 654 (6th Cir. 2012) .................................................................14, 27

*McNeill v. Wayne County*,
     300 F. App'x 358 (6th Cir. 2008) ..............................................................7, 24

*Mich. Corr. Org. v. Mich. Dep't of Corr.*,
     774 F.3d 895 (2014).....................................................................................14

*Mingus v. Butler*,
     591 F.3d 474 (6th Cir. 2010) .......................................................................16

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*,
     429 U.S. 274 (1977).....................................................................................12

*Nev. Dep't of Human Res. v. Hibbs*,
     538 U.S. 721 (2003).....................................................................................15

*O'Brien v. Mich. Dep't of Corr.*,
    592 Fed. Appx. 338, 2014 WL 7533852 (6th Cir. Oct. 17, 2014).................................8, 24, 25

*Pa. Dep't of Corr. v. Yeskey*,
    524 U.S. 206 (1998)...........................................................................................................6, 13, 23

*Parratt v. Taylor*,
    451 U.S. 527 (1981)......................................................................................................................17

*Paul v. Davis*,
    424 U.S. 693 (1976)......................................................................................................................17

*Pierce v. Ohio Dept. of Rehab. and Corr.*,
    284 F.Supp.2d 811 (N.D. Ohio 2003)..................................................................................5, 9

*Post v. Mohr*,
    2012 WL 76894 (N.D. Ohio, Jan. 10, 2012)............................................................................27

*Reich v. City of Elizabethtown*,
    945 F.3d 968 (6th Cir. 2019) .....................................................................................................11

*Rhinehart v. Scutt*,
    894 F.3d 721 (6th Cir. 2018) ...............................................................................................19, 20

*Estate of Romain v. City of Grosse Point Farms*,
    935 F.3d 485 (6th Cir. 2020) .....................................................................................................16

*Ruff v. Runyon*,
    258 F.3d 498 (6th Cir. 2001) .....................................................................................................27

*Rumsey v. Martin*,
    28 Fed. App'x 500 (6th Cir. 2002) ..........................................................................................20

*Savino v. City of New York*,
    331 F.3d 63 (2d Cir. 2003)......................................................................................................5, 9

*Scott v. Harris*,
    550 U.S. 372 (2007)......................................................................................................................10

*Seminole Tribe of Florida v. Florida*,
    517 U.S. 44 (1996)........................................................................................................................12

*Sjostrand v. Ohio State Univ.*,
    750 F.3d 596 (6th Cir. 2014) ...............................................................................................7, 24

*Skelton v. Pri-Cor, Inc.*,
    963 F.2d 100 (6th Cir. 1991) (per curiam), *cert. denied,* 118 L. Ed. 2d 398,
    112 S. Ct. 1682 (1992)..................................................................................................................11

*Swain*,
  2020 U.S. App. LEXIS 18689, *23 (11th Cir. 2020) ............................................................22

*Taylor v. Plousis*,
  101 F. Supp. 2d 255, 2000 U.S. Dist. LEXIS 8579 ..............................................................8

*Tennessee v. Lane*,
  541 U.S. 509 (2004).................................................................................................13, 15

*Thornton v. Fed. Express Corp.*,
  530 F.3d 451 (6th Cir. 2008) ..............................................................................................7, 24

*Tri-Cities Hldgs, LLC v. Tenn. Admin. Procedures Div.*,
  726 F. App'x 298 (6th Cir. 2018) ......................................................................................6, 23

*United States v. Georgia*,
  546 U.S. 151 (2006)................................................................................................... *passim*

*United States v. Morrison*,
  529 U.S. 598 (2002)..............................................................................................................12

*Virginia Office of Prot. & Adv. v. Stewart*,
  563 U.S. 247 (2011)..............................................................................................................12

*Wagner v. Jett*,
  1994 U.S. App. LEXIS 27812 ............................................................................................11

*Wilkerson v. Utah*,
  99 U.S. 130 (1878)...............................................................................................................19

*Wilkins v. Gaddy*,
  559 U.S. 34 (2010)...............................................................................................................18

*Wilson v. Garcia*,
  471 U.S. 261 (1985)............................................................................................................26

*Wilson v. Seiter*,
  501 U.S. 294 (1991)............................................................................................................19

**Statutes, Codes & Rules**

42 U.S.C. § 12101 ....................................................................................................8, 21, 24

42 U.S.C. § 12131 ......................................................................................................13, 25

42 U.S.C. § 12132 ........................................................................................................6, 23

42 U.S.C. § 12202 ..............................................................................................................14

R.C. § 121.02(P) ..................................................................................................................12

Fed. R. Civ. P. 56..........................................................................................................5, 9, 10

<u>**MEMORANDUM**</u>

## I.    INTRODUCTION

Plaintiff is an inmate that came to the custody of ODRC with existing injuries and used a cane on several occasions during his incarceration. The use of the cane was granted on the basis of medical necessity at the time the exception or accommodation was given. Based on the evidence presented, it is clear that Plaintiff Creech has not been excluded from any programs, services, or activities at the prison. Defendant ODRC has not discriminated against Plaintiff because of his disability (or for any other reason). The undisputed evidence attached demonstrates that this Court should grant summary judgment in favor of Defendant ODRC.

## II.    PROCEDURAL HISTORY

### 1.    Complaint

Scott David Creech, an inmate in the custody of ODRC, alleges that on August 23, 2016, while incarcerated at the Chillicothe Correctional Institution (CCI), Certified Nurse Practitioner Gary Artrip "overroad the Orthopedic Surgeon's order for the continued use of [a] cane." (Doc. 17, Amended Complaint, PageId# 40). According to Plaintiff, he entered CCI with a "mobility device" and after a short time without his cane, he was transferred to CCI with it in December 2008. (*Id*). Plaintiff alleges that CNP Artrip "discontinued any further access to a cane." (*Id*). Plaintiff also alleges that he "has suffered extreme pain issues and has had multiple incidents where he was unable to walk any distance beyond the unit without falling." (*Id*).

Plaintiff complains that he "has had sharp paralizing (sic) pains in his hip and down his leg since having his cane seized. (*Id.* at PageId# 41). He also alleges that his "health has, and is continually, being adversely affected (sic) due to the fact that [his] mobility has been greatly reduced after the removal/loss of his cane." (*Id*). Plaintiff alleges that ODRC had "failed to

accommodate [his] disability by limiting [his] mobility" such that he cannot eat in the chow hall, preventing him from having full access to the law library, and limiting his access to the exercise facilities in the prison. (*Id*). Plaintiff also alleges that the removal of his cane 'has caused him to fall on several different occasions. (*Id*.). Plaintiff is seeking the use of a cane and compensatory damages in the amount of $250,000.00. (Doc. 17, Amended Complaint, PageId# 42).

After reviewing the complaint, this Court allowed Plaintiff the opportunity to proceed with his Americans with Disabilities Act claim against Defendant ODRC. (Doc. 3 & 7, R&R and Order). All other claims and parties were dismissed. (*Id*.) On April 1, 2019, Defendant ODRC filed an answer. (Doc. 11).

## 2. Facts

Plaintiff, David Scott Creech, was involved in a motorcycle accident in June 1987. (Doc. 66-1, PageId # 447, 462-465). In 1988 Plaintiff filed for disability and found permanently disabled. (Doc. 66-1, PageId # 460-461). When he was not in prison, Plaintiff did not regularly use his cane, he mostly used it to exercise. (*Id.* at 482). From 1999-2002 Plaintiff did not use a cane every day. (*Id.* at 483).

Plaintiff was confined to ODRC custody on October 15, 2008[1] for two counts of unlawful possession of a dangerous ordinance (one felony of the second degree and one felony of the fifth degree), two counts of illegal possession of chemicals (one felony of the second degree and one felony of the third degree), and two counts of weapons under disability (both felonies of the third degree). Plaintiff's stated prison term was nineteen years with an expected release date of March 11, 2027.

---

[1] https://appgateway.drc.ohio.gov/OffenderSearch/Search/Details/A588782 (last checked on September 14, 2020).

When he was processed into ODRC custody, he had a prescription for a cane as a mobility device. (Doc. 66-1, PageId # 495). The prescription was written by his personal, civilian doctor located in Waverly, Ohio—David M. Hoxie, M.D.[2] (Doc. 66-1, PageId # 490). In his initial months of confinement Plaintiff went without a mobility device, he was reissued a cane when he was transferred to CCI. (*Id.* at 488). Plaintiff then had a mobility device prescribed to him as a medical restriction as defined in ODRC policy:

> Medical Restriction: A medical accommodation written by a physician or other advanced health care provider, used to address a serious medical need. ***Medical restriction orders are temporary and must be regularly reviewed and rewritten.***

(Exhibit C, p. 1 (emphasis added)). Plaintiff had his medical restrictions for a lower bunk and the use of a cane reviewed at least seven times prior to August 23, 2016. (Exhibit E, pp. 101-107 (Renewed from 7/27/2011 – 10/27/2011 10/4/2011 – 10/4/2012, 10/05/2012 – 10/05/2013, 2/14/2014 – 8/14/2014, 9/16/2014 – 9/6/2015, and 9/21/2015 – 9/21/2016)).

During his incarceration, when Plaintiff had his cane, he walked "three, four, five miles per day." (Doc. 66-1, PageId # 505; *see also* 509, 511). Plaintiff admitted that he was in relatively good health, but he had pain in 2016, but the pain was eased through the use of a cane. (*Id.* at 531, 537, 548). Plaintiff stated that the cane alleviated the pressure on his left knee. (*Id.* at 514).

During a physical examination on August 23, 2016 at CCI's clinic, Certified Nurse Practitioner (CNP) Gary Artrip noted that Plaintiff's "cane [was] not medically indicated based upon mobility." (*Id.* at p.13). CNP Artrip was an "advanced health care provider" as defined by ODRC policy—capable of making decisions regarding medical restrictions. (Exhibit E, p. 1;

---

[2] Doctor Hoxie's license to practice medicine was permanently revoked in 2003. The case built against him supported the finding that the doctor failed to cooperate in the investigation as he gave false answers on his license applications, during an interview, and during a deposition. The doctor's testimony went well beyond technically inaccurate statements, inept disclosures, or unintentional misrepresentations. The doctor's intent to deceive was reasonably inferred from the surrounding circumstances." See *Hoxie v. Ohio State Med. Bd.*, 2006-Ohio-646.

3

Exhibit B, ¶ 4). On August 23, 2016, CNP Artrip opined that Plaintiff's "use of a cane was no longer medically indicated." (Exhibit B, ¶ 12). CNP Artrip based his decision on his medical expertise after "observing Inmate Creech during a clinic evaluation, personal observations of him walking in the yard and through the hallways, review of his medical file, and the institutional security concerns regarding the use of a cane." (*Id.*) Plaintiff admitted that he knew the cane was a security risk, that he had heard about another inmate hitting a guard with a cane, knew that assaults happened often in prison, and that he had seen other inmates attack guards. (*Id.* at 515-517).

Following Plaintiff's clinic visit in August 2016, Plaintiff did not use a cane to walk in the prison because he was not allowed to have it after it was found to be not medically necessary. Plaintiff, generally, followed the informal grievance procedures set forth by Ohio law to get his cane back. (Exhibit D). In the meantime, Plaintiff chose to the majority of his meals from the commissary rather than the chow hall because he did not want to wait in line, stating that it often caused him pain to do so. (Doc. 66-1, PageId # 541-2, 538). Plaintiff admitted that the commissary food is a "pretty good variety" and that he gets to eat "fish, chicken, and vegetables." (*Id.* at 542-543). Additionally, Plaintiff continued to use the yard and walk miles a day, sometimes more than one mile two to three times a week after his cane was confiscated in 2016. (*Id.* at 560, 506-507). This was a decrease from the four to five miles a day that Plaintiff was walking when he had his cane. (*Id.* at 587, 612, 620). Plaintiff admitted that between the years of 2016 and 2019 he was still able to walk between one and three times per week. (*Id.* at 511). This was approximately the same amount of walking as he admitted to doing after he received his cane in 2019; he walks three times a week and two miles at a time. (*Id.*)

4

Plaintiff continued to use the law library and the facilities in the prison, though he complains that it caused him more pain to do so. (*Id.*at 578). Plaintiff was unable to state a time and or date when he fell because he did not have access to his cane. (*Id.* at 504-514). Plaintiff stated that he was in generally good health, but he had gained approximately ten pounds after his cane was confiscated. (*Id.* at 532-533). However, Plaintiff does not have diabetes or heart disease. (*Id.* at 533-555). Plaintiff admitted to using the cane to climb to the top of the bleachers on the yard "where [he]'d be able to see and watch" the games and activities on the yard. (*Id.* at 576-577). The record is devoid of information describing any programs, activities, or other events that Plaintiff's able-bodied counterparts were able to participate in that Plaintiff was not, due to ODRC, able to participate in as well.

On April 9, 2019 Plaintiff was seen at the CCI clinic by CNP Nathan Ross. (Exhibit E, p 18). During this encounter, CNP Ross noted that Plaintiff "ha[d] no complaints at this time." (*Id.).* On April 23, 2019, Plaintiff filed a Health Services Request stating "I need a back brace, knee brace, and cane. My medical condition is rapidly getting worse." (*Id.* at p.17). On May 1, 2019, Plaintiff was seen at the prison clinic by CCI's Chief Medical Officer, Sonya Peppers, M.D. (*Id.* at p. 22-24; Exhibit A). During this encounter Plaintiff stated that he "had a cane for several years but it was recently taken from him... states that at times his knee will give out on him and the cane offers support… [he] was previously walking 4 miles/per day with the assistance of his cane." (*Id.* at p. 22). In addition, during this encounter Plaintiff "denie[d] any recent falls or tripping" and "admit[ted] that he does not use the cane he just has it just in case." (*Id.* at 22-23).

Dr. Peppers noted in the May 1, 2019 encounter that she would "review his old records to determine need for a cane." (*Id.* at 23). Dr. Peppers issued Plaintiff a cane on September 23, 2019 to assist with his ambulation. (Exhibit A, ¶11). This issuance of the cane was "based on a [her]

review of his old medical records, Inmate Creech's complaints of a new joint complaint, a new physical exam, and [her] medical opinion." (*Id*.). At no time did Dr. Peppers "opine that Inmate Creech had a qualifying disability under the Americans with Disabilities Act (ADA)." (*Id.* at ¶ 12).

## III.     Opposition to Summary Judgment

The standard governing summary judgment is set forth in Fed. R. Civ. P. 56(a), which provides: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id*. A party asserting that a fact cannot be genuinely disputed must support the assertion by citing to materials in the record, including depositions, documents, affidavits or declarations, stipulations, admissions, or interrogatory answers, etc. *See* Fed. R. Civ. P. 56(c). Summary judgment will not lie if there is a genuine dispute about material facts. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A dispute is 'genuine' when 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Dearing v. Mahalman,* No. 1:11-cv-204, 2013 U.S. Dist. LEXIS 188064, * 8 (S.D. Ohio Oct. 7, 2013) (citing *Anderson,* 477 U.S. at 248). Moreover, on a motion for summary judgment the court must resolve all ambiguities and draw all reasonable factual inferences in favor of the non-moving party. *See Savino v. City of New York,* 331 F.3d 63, 71 (2d Cir. 2003) (citing *Anderson,* 477 U.S. at 255).

Once the moving party has met its burden of production, the non-moving party cannot rest on mere allegations or denials of his pleadings, but must present "significant probative evidence in support of his complaint to defeat the motion for summary judgment." *Dearing, 2*013 U.S. Dist. LEXIS at * 8 (citing *Anderson,* 477 U.S. at 248). General averments or conclusory allegations of an affidavit, however, do not create specific fact disputes for summary judgment purposes. *Pierce v. Ohio Dept. of Rehab. and Corr.,* 284 F.Supp.2d 811, 822, (N.D. Ohio 2003) (citing *Lujan v.*

*National Wildlife Federation,* 497 U.S. 871, 888-89, (1990)). Additionally, "[t]he mere existence of a scintilla of evidence to support the non-moving party's position will be insufficient; the evidence must be sufficient for a jury to reasonably find in favor of the nonmoving party." *Dearing, 2*013 U.S. Dist. LEXIS at * 8 (citing *Anderson,* 477 U.S. at 252). Summary judgment is appropriate if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp v. Catrett*, 417 U.S. 317, 322 (1986); *see also Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 588 (1986).

Plaintiff posits in his Motion for Summary Judgment that he is a qualified individual under the ADA because he received social security for "said disability" until the time he was incarcerated in 2008. (Doc. 65, PageId # 304). Moreover, he alleges the conduct of ODRC is a "clear violation" of the ADA. (*Id.*) Plaintiff admits that he bears the burden to prove that he is a qualified individual under the Act. (*Id.* at 309). Plaintiff alleges that he has a disability, however he fails to show that he has a physical impairment that substantially limits one or more major life activities—his assertions are nothing more than that, bald assertions with no underlying evidence to support them.

"Title II of the ADA . . . extends to state prison inmates." *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 213 (1998). Title II of the ADA states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. "'To establish a *prima facie* case of intentional discrimination under Title II of the ADA, a plaintiff must show that: (1) she has a disability; (2) she is otherwise qualified; and (3) she was being excluded from participation in, denied the benefits of, or subjected to discrimination under the program because of her disability.'" *Tri-Cities Hldgs, LLC v. Tenn.*

*Admin. Procedures Div.*, 726 F. App'x 298, 308 (6th Cir. 2018) (quoting *Anderson v. City of Blue Ash*, 798 F.3d 338, 356 (6th Cir. 2015)). *See also Ability Ctr. of Greater Toledo v. City of Sandusky*, 385 F.3d 901, 907 (6th Cir. 2004) ("Title II does more than prohibit public entities from intentionally discriminating against disabled individuals. It also requires that public entities make reasonable accommodations for disabled individuals so as not to deprive them of meaningful access to the benefits of the services such entities provide."). "In the typical Title II case, the plaintiff alleges she was denied reasonable accommodations in violation of the Act." *Sjostrand v. Ohio State Univ.*, 750 F.3d 596, 599 (6th Cir. 2014).

A disability determination by the Social Security Administration, even if substantiated, is not controlling for determination of ADA disability. *Thornton v. Fed. Express Corp.*, 530 F.3d 451, 455 (6th Cir. 2008); *McNeill v. Wayne County*, 300 F. App'x 358, 362 (6th Cir. 2008) (rejecting the plaintiff's argument that a record of her Social Security disability benefits controlled the determination of her ADA disability). The Supreme Court has compared the two procedures for determining disability and concluded that an individual qualifying for Social Security disability could otherwise fail to be substantially limited in performing major life activities under the ADA. *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 803–04 (1999). The Court also declined to find the disability designations equivalent because the Social Security Administration's procedure involves a variety of presumptions, including a list of automatically qualifying impairments that are distinct from the ADA's definition. *Id.* at 804–05.

Under the first element, the ADA defines "disability" as:

(A) a physical or mental impairment that substantial limits one or more of the major life activities of such individual;

(B) a record of such an impairment; or

(C) being regarded as having such an impairment.

42 U.S.C. § 12102(2). "Acts and omissions which have a disparate impact on disabled persons in general [are] not specific acts of intention discrimination against [the plaintiff] in particular." *Dillery*, 398 F.3d at 568 (quoting *Tyler v. City of Manhattan*, 118 F.3d 1400, 1403 (10th Cir. 1997)). Allegations that "defendants denied him treatment in retaliation for filing grievances an in an effort to cut cost," is not a sufficient showing of discrimination because of disability. *O'Brien v. Mich. Dep't of Corr.,* 592 Fed. Appx. 338, 344, LEXIS 24722 at *13, 2014 WL 7533852 (6th Cir. Oct. 17, 2014).

To bolster his argument, Plaintiff cites to two cases (*Taylor v. Plousis*, 101 F. Supp. 2d 255, 2000 U.S. Dist. LEXIS 8579; *Johnson v. Hardin County*, 908 F.2d 1280, 1990 U.S. App. LEXIS 12163) and posits that his disability is the same or similar to that of those plaintiffs. The first case deals with a prosthetic leg and deliberate indifference under the 8th Amendment and the second case's Plaintiff has one broken leg and an injured knee on the other leg requiring immobilization and crutches. (*Id*.). Neither of these cases demonstrate that Plaintiff's "disability makes him a qualified individual under the Act.  Moreover, neither of those plaintiffs were walking at all without the assistance of medical devices (the prosthetic leg and crutches) which is a far cry from what Plaintiff was doing—including walking and completing his daily job as a porter. (*Id*.; (Doc. 66-1, PageId # 552-555).

In addition to not being a qualified individual under the ADA, Plaintiff has utterly failed to demonstrate how ODRC discriminated against him ***based upon his disability*** by not allowing him to have a cane as a mobility device. Plaintiff has not stated facts showing when ODRC or any employee precluded him from participating in an activity or program because he was disabled. Plaintiff was still able to go out on the yard, go to the chow hall, visit the law library, and do all

other events or services that the other able-bodied inmates were doing. (See Doc. 66-1, PageId # 576-582).

## IV.    CROSS-MOTION FOR SUMMARY JUDGMENT

The standard governing summary judgment is set forth in Fed. R. Civ. P. 56(a), which provides: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id*. A party asserting that a fact cannot be genuinely disputed must support the assertion by citing to materials in the record, including depositions, documents, affidavits or declarations, stipulations, admissions, or interrogatory answers, etc. *See* Fed. R. Civ. P. 56(c). Summary judgment will not lie if there is a genuine dispute about material facts. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A dispute is 'genuine' when 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Dearing v. Mahalman,* No. 1:11-cv-204, 2013 U.S. Dist. LEXIS 188064, * 8 (S.D. Ohio Oct. 7, 2013) (citing *Anderson,* 477 U.S. at 248). Moreover, on a motion for summary judgment the court must resolve all ambiguities and draw all reasonable factual inferences in favor of the non-moving party. *See Savino v. City of New York,* 331 F.3d 63, 71 (2d Cir. 2003) (citing *Anderson,* 477 U.S. at 255).

Once the moving party has met its burden of production, the non-moving party cannot rest on mere allegations or denials of his pleadings, but must present "significant probative evidence in support of his complaint to defeat the motion for summary judgment." *Dearing, 2*013 U.S. Dist. LEXIS at * 8 (citing *Anderson,* 477 U.S. at 248). General averments or conclusory allegations of an affidavit, however, do not create specific fact disputes for summary judgment purposes. *Pierce v. Ohio Dept. of Rehab. and Corr.,* 284 F.Supp.2d 811, 822, (N.D. Ohio 2003) (citing *Lujan v. National Wildlife Federation,* 497 U.S. 871, 888-89, (1990)). Additionally, "[t]he mere existence

10

of a scintilla of evidence to support the non-moving party's position will be insufficient; the evidence must be sufficient for a jury to reasonably find in favor of the nonmoving party." *Dearing, 2*013 U.S. Dist. LEXIS at * 8 (citing *Anderson,* 477 U.S. at 252). Summary judgment is appropriate if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp v. Catrett*, 417 U.S. 317, 322 (1986); *see also Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 588 (1986).

As the facts, and analysis, clearly show, it is Defendant ODRC that is entitled to judgment as a matter of law. As the Supreme Court of the United States has emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).

"[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). And when opposing parties tell two different stories, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment. *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007).

Moreover, on summary judgment review, the court must determine whether the evidence presents a sufficient dispute of material fact so as to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. *Anderson*, 477 U.S. at, 251-52. Where,

however, a plaintiff's version of the facts is "conclusively contradicted by the record that no reasonable jury could believe it", a Court need not rely on the nonmovant's version that is so "utterly discredited by the record" as to render it a "visible fiction." *Chappell v. City of Cleveland*, 585 F.3d 901, 906 (6th Cir. 2009).

Furthermore, as established by the Sixth Circuit in *Reich v. City of Elizabethtown*, 945 F.3d 968, (6th Cir. 2019) "[t]hough we view the facts in the light most favorable to [the non-moving party], we note that [his] version of events only faintly resembles the picture offered by the officers, the eyewitnesses, and the medical evidence." Thus, "all *reasonable* inferences are drawn in favor of the plaintiff, to the extent supported by the record." *Reich v. City of Elizabethtown*, 945 F.3d at 980 (quoting *Chappell*, 585 F.3d at 909) (emphasis in original).

"The courts must accord prison administrators wide-ranging deference in matters concerning the adoption and execution of policy and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Wagner v. Jett*, 1994 U.S. App. LEXIS 27812, *3-4 *Cf.* citing *Bell v. Wolfish,* 441 U.S. 520, 547, 60 L. Ed. 2d 447, 99 S. Ct. 1861 (1979); *see also Skelton v. Pri-Cor, Inc.,* 963 F.2d 100, 103-04 (6th Cir. 1991) (per curiam), *cert. denied,* 118 L. Ed. 2d 398, 112 S. Ct. 1682 (1992). No reasonably jury could find in favor of the Plaintiff after viewing all evidence in the light most favorable to him. Plaintiff's version of the facts is conclusively contradicted by the record so as to render it a "visible fiction" as articulated by the Sixth Circuit Court of Appeals. *Chappell v. City of Cleveland*, 585, F.3d 901, 906 (6th Cir. 2009).

## V.    ARGUMENT.

### 1.    Claims against the Ohio Department of Rehabilitation and Correction (ODRC) are barred by Eleventh Amendment Immunity.

As an initial matter, Defendant ODRC is entitled to Eleventh Amendment Immunity. *Edelman v. Jordan*, 415 U.S. 651, 662 (1974). "Each state is a sovereign entity" and is "not amenable to suit absent consent." *Allen v. Cooper*, 140 S.Ct. 994, 999 (2020).  "[T]hat fundamental aspect of sovereignty constrains federal 'judicial authority.'" (*Id*.) In defining the scope of the Eleventh Amendment, the Supreme Court has determined that federal jurisdiction over suits against unconsenting states "was not contemplated by the Constitution when establishing the judicial power of the United States." S*eminole Tribe of Florida v. Florida*, 517 U.S. 44, 54 (1996). According to the Supreme Court, "the Constitution was understood, in light of its history and structure, to preserve the State's traditional immunity from private suits." *Alden v. Maine*, 527 U.S. 706, 724 (1999). "[A]bsent waiver or valid abrogation, federal courts may not entertain a private persons' suit against a State." *Virginia Office of Prot. & Adv. v. Stewart*, 563 U.S. 247, 254 (2011). Arms-of-the-State, like ODRC, are merely one of many agencies that the State of Ohio created to serve its citizenry, and thus partakes of Eleventh Amendment immunity. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977); See also, R.C. § 121.02(P). Enforcement of its criminal law to ensure public safety, and the incarceration that logically follows from serving those interests, is a fundamental aspect of state sovereignty. *United States v. Morrison*, 529 U.S. 598, 618 (2002) ("Perhaps the clearest example of traditional state authority is the punishment of local criminal activity."). Ohio has a strong interest in defending the basic tenets of Federalism, like duel sovereignty, which is a "defining feature of our Nation's constitutional blueprint." *Fed. Mar. Comm'n v. South Carolina State Ports Auth*., 535 U.S. 743, 751 (2002).

Admittedly, the passage of the Fourteenth Amendment, "'fundamentally altered the balance of the state and federal power' that the original Constitution and the Eleventh Amendment struck." *Allen*, 140 S.Ct. at 1002.  Section 1 of the Fourteenth Amendment imposes certain restrictions on the States, while Section 5 gives Congress the "power to enforce, by appropriate legislation" those restrictions. (*Id*.) "That power... may enable Congress to abrogate the State's immunity and thus subject them to suit in federal court." (*Id.)* Thus, Congress is permitted to allow "suits against States" so long as the legislation remedies "actual violations of the rights guaranteed in Section 1." (*Id.)* However, Congress is not permitted to bar conduct which falls well beyond the scope of what Section 1 proscribes. (*Id*.) To allow such a broad abrogation, would essentially permit Congress the unthinkable authority to drastically redefine the parameters of the Fourteenth Amendment. *City of Boerne v. Flores*, 521 U.S. 507, 520-521 (1997). Such infinite authority would subject the States to each and every Congressional whim, and render Federalism a civic relic of the past. (*Id*.)  In other words, "congressional abrogation is valid under Section 5 only if it sufficiently connects to conduct courts have held Section 1 proscribe." *Allen*, supra, at 1004.

Title II of the ADA prohibits a public entity, including state prisons, from discriminating against inmates who qualifies as a person under disability on account of that disability. 42 U.S.C. § 12131; *See also, Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206 (1998). As the Supreme Court has already recognized, state prisons are public entities under the ADA. *Yeskey*, 524 U.S. at 210. However, *Yeskey* did not address Eleventh Amendment Immunity. For the Title II of the ADA to apply to Ohio, Ohio must have waived their immunity or Congress appropriately abrogated its immunity in the language of the ADA. *Bd. of Trustees of the Univ. of Alabama v. Garrett,* 531 U.S. 356, 364 (2001); *Tennessee v. Lane*, 541 U.S. 509, 518 (2004); *United States v. Georgia*, 546 U.S. 151, 159 (2006). It is well settled that Ohio has not waived its immunity in federal court.

*McCormick v. Miami Univ.*, 693 F.3d 654, 664 (6th Cir. 2012). As it relates to abrogation, "Congress may abrogate the States' sovereign immunity through its Section 5 power to enforce … laws that target actual violations of the Fourteenth Amendment … and laws that go beyond the protections of the Fourteenth Amendment so long as there is 'a congruence and proportionality' between the statutory rights and Fourteenth Amendment violations by the State." *Mich. Corr. Org. v. Mich. Dep't of Corr.*, 774 F.3d 895, 901 (2014).

As to statutory language, Defendant must concede that Congress has abrogated its immunity in the plain language of the ADA. See, *Board of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363-64 (2001); See, 42 U.S.C. § 12202. However, the question now becomes whether Congress had the authority under §5 of the Fourteenth Amendment, to abrogate Eleventh Amendment as broadly as the reach of Title II. (*Id*. at 434 ("Sect. 5 legislation reaching beyond the scope of § 1's actual guarantees must exhibit 'congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end.'")). "Always, what Congress has done must be in keeping with the Fourteenth Amendment rules it has the power to enforce." *Allen*, supra, at 996. Because the ADA was never meant specifically to "enforce Section 1" as to the particular context of Creech's allegations of medical malpractice, it is not "appropriate under Section 5." (*Id*.) In other words, as it relates to the allegation in this case, the ADA exceeds Congress' section 5 power.

Providing guidance, the Supreme Court explained that "insofar as Title II creates a private cause of action for damages against the State for conduct that actually violates the Fourteenth Amendment, Title II validly abrogates state sovereign immunity." *United States v. Georgia*, 546 U.S. 151, 159 (2006). However, if the actions of the State agency violate Title II, but not the Fourteenth Amendment, then this Court must determine whether there is "a congruence and

15

proportionality between the injury to be prevented or remedied and the means adopted to that end." *Flores*, 521 U.S. at 520; *Garrett*, 531 U.S. at 367-370; *Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 68-70 (2000). More specifically, this Court must consider (1) the constitutional right Congress sought to enforce when passed Title II; (2) has Congress identified a history and pattern of unconstitutional disability discrimination; and (3) whether the remedies identified in Title II are congruent and proportional to the constitutional violation. *Lane*, 541 U.S. at 511. In *Garrett*, the Court refused to apply Title I of the ADA to the University of Alabama because "[t]he legislative record of the ADA, however, simply fail[ed] to show that Congress did in fact identify a pattern of irrational state discrimination in employment against the disabled." *Garrett*, 531 U.S. at 368. However, in *Lane*, the Supreme Court found that Title II of the ADA did validly abrogate Eleventh Amendment immunity insofar "as it applies to the class of cases implicating the fundamental right of access to the courts." *Lane*, 541 U.S. 529.  In other words, this Court must determine "whether subjecting the States and their treasuries to monetary liability at the insistence of private litigants is congruent and proportional response to demonstrated pattern of unconstitutional conduct by the State." *Nev. Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 744 (2003) (J. Scalia, dissenting). As the Supreme Court recognized in *Flores*, "Congress' power under § 5, however, extends only 'enforcing' the provisions of the Fourteenth Amendment… [and] [l]egislation which alters the meaning… cannot be said to be enforcing the Clause." *Flores*, 521 U.S. at 519.

It is undisputed that by enacting the ADA, Congress actually invoked § 5 of the Fourteenth amendment, which enables it to enforce that amendment. *Lane*, 541 U.S. at 513, citing, 42 U.S.C. § 12202. However, Title II is much broader in scope and reach than the Fourteenth Amendment. *Anderson v. City of Blue Ash*, 798 F.3d 338, 356-57 (6th Cir. 2015). In *United States v. Georgia*, the Supreme Court held that Title II validly abrogates state sovereign immunity and permits a

16

private cause of action for damages against a state for conduct that violates the Fourteenth Amendment. 546 U.S. at 150. The Supreme Court clarified that lower courts, on a "claim-by-claim basis" must determine (A) whether the State conduct violated Title II; (B) whether that same conduct violated the Fourteenth Amendment. (*Id*.) If both are implicated, the claim can proceed. (*Id*. at 151.) However, if the claim was found to violate Title II and not the Fourteenth Amendment, then a determination must be made whether Congress purported abrogation of sovereign immunity as to that class of conduct was valid. (*Id*. at 152.) This test is required to be conducted in every Title II case where the States raises sovereign immunity. *Mingus v. Butler*, 591 F.3d 474, 482 (6th Cir. 2010).

Any alleged history of prisons denying inmates aids for mobility, like canes, was certainly not Congress's motivation for the passage of Section 5 of the Fourteenth Amendment, or what the States envisioned when they approved and adopted the Fourteenth Amendment.[3] In fact, members

---

[3] The Fourteenth Amendment was enacted and ratified to ensure the constitutionality of the Civil Rights Act of 1866. *Estate of Romain v. City of Grosse Point Farms*, 935 F.3d 485, 496 (6th Cir. 2020) (J. Murphy concurring), citing, Currie, David P., *The Constitution in the Supreme Court: The First Hundred Years, 1789-1888*, at 347-349 (1985). "The history of § 1983 begins with the Civil Rights Act of 1866[.]" *Chapman v. Houston Welfare Rights Organization*, 441 U.S. 600, 628 (1979). In fact, the Fourteenth Amendment was passed to "eliminate doubt as to the constitutional validity of the Civil Rights Act as applied to the States." *Hurd v. Hodge*, 334 U.S. 24, 32-33 (1948); See also, *Bell v. Maryland*, 378 U.S. 326, 292 (1964) ("The Fourteenth Amendment was in part designed to provide a firm constitutional basis for the Civil Rights Act of 1866[.]") "Both the Civil Rights Act of 1866 and the joint resolution which was later adopted as the Fourteenth Amendment were passed in the first session of the Thirty-Ninth Congress." *Hurd*, 334 U.S. at 33. Hence, the "statute and the Amendment were expressions of the same general congressional policy." *Id*. Because the Civil Rights Act of 1866 was never intended to supplant or replace traditional tort law, which includes medical malpractice, it follows that the Fourteen Amendment fails to cover the same areas traditionally left the state judiciary.

of Congress made it clear that they did not intend for the Fourteen Amendment, or the Civil Rights Acts, to supplant traditional tort law. Creech's allegations regarding ODRC's medical staff's decision to deprive Creech the use of a cane does not even implicate the Fourteenth Amendment. The Fourteenth Amendment was never intended to become "a font of tort law[.]" *Paul v. Davis*, 424 U.S. 693, 701 (1976). In other words, damages sustained as result of tortious conduct "must be sought in state court under traditional tort-law principles." *Baker v. McCollan*, 443 U.S. 137, 147 (1979). "Nowhere does the Constitution 'purport to supplant traditional tort law in laying down rules of conduct to regulate liability for injuries that attend living together in society.'" *Doe v. Jackson Local Sch. Dist.*, 954 F.3d 925, 933 (6th Cir. 2020), citing, *Daniels v. Williams*, 474 U.S. 327, 332 (1986). "The Constitution instead leaves those rules of the behavioral road for the states themselves to regulate." (*Id.*) Hence, "the common-law duties owed by government officials" was never intended be "somehow constitutionalized by the Fourteenth Amendment." *Daniels*, 474 U.S. at 335. The Supreme Court has recognized the "'constitutional shoals' that confront any attempt to derive from congressional civil rights statutes a body of general federal tort law" and the Fourteenth Amendment "cannot be a source of such law." *Davis*, 424 U.S. at 701. The Court has routinely rejected arguments that the Fourteenth Amendment "should be interpreted to impose federal duties that are analogous to those traditionally imposed by state tort law." *Collins v. City of Harker Heights*, 503 U.S. 115, 128 (1992). The "drafters of the Fourteenth Amendment" never "intended the Amendment to play such a role in our society." *Parratt v. Taylor*, 451 U.S. 527, 544 (1981).

"In 1868, when the Fourteenth Amendment was ratified, a majority of the States and numerous Territories… would no doubt [be in] shock… to learn that one of the new constitutional Amendments contained hidden within the interstices of its text" a meaning that allows state

inmates, under the ADA, to bypass state forums and sue the states in federal court, for alleged acts of medical negligence. *June Med. Servs. L.L.C. v. Russo*, 140 S. Ct. 2103, 2151 (2020) (J. Thomas dissenting). Simply picking up, and browsing a history book, "proves" that such an interpretation of the Eighth Amendment is "more than hidden—it simply was not (and is not) there." (*Id.*) In fact, it is doubtful that the Eighth Amendment, as an original matter, or its general understanding when the Fourteenth Amendment was passed by Congress and adopted by the States, was known to prohibit deliberate indifference to serious medical conditions in regards to medical care provided to incarcerated inmates.[4] After all, the Eighth Amendment prohibits cruel and unusual *punishments*, and the word "punishments" most naturally connotes something carried out "as part of a sentence," not inadequate medical care during the carrying out of that sentence. *Helling v. McKinney*, 509 U.S. 25, 42 (1993) (Thomas, J., dissenting); *accord Wilkins v. Gaddy*, 559 U.S. 34, 41 (2010) (Thomas, J., concurring in the judgment). Defendants concede that this Court is bound by precedents recognizing the viability of deliberate-indifference claims in Eighth Amendment cases. However, that does not necessarily translate to extending deliberate indifference caselaw as a floor for ADA challenges. In fact, the Constitution's original meaning, as well as the Congressional record from the passage of the Fourteenth Amendment, counsels against *extending* the doctrine for the sort of conduct that is actionable under the ADA. While this court is bound by Supreme Court and Sixth Circuit precedents with regard to the Eighth Amendment, when it comes to interpreting those precedents in an ADA context, it "should resolve questions about the scope of those precedents in light of and in the direction of the constitutional

---

[4] Only "[f]ive states in 1868 - a small minority - had clauses with explicit prisoners-rights protections in their state constitutions." Calabresi & Agudo, *Individual Rights Under State Constitutions when the Fourteenth Amendment Was Ratified in 1868: What Rights Are Deeply Rooted in American History and Tradition?*, 87 Tex. L. Rev. 7, 84 (2008)

text and constitutional history." *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 537 F.3d 667, 698 (D.C. Cir. 2008) (Kavanaugh, J., dissenting). The Supreme Court "did not so much as intimate that the Cruel and Unusual Punishments Clause might reach prison conditions for the first 185 years of the provision's existence." *Helling v. McKinney*, 509 U.S. 25, 39-40 (1993) (J. Thomas dissenting). Medical malpractice "would not be punishment in anything remotely like the accepted meaning of the word, whether we consult the usage of 1791, or 1868, or 1985." *Seiter*, 501 U.S. at 300, citing *Duckworth* v. *Franzen*, 780 F.2d 645, 652 (CA7 1985) (J. Posner).

It is beyond dispute, that the original intentions behind the Eighth Amendment was to proscribe punishments that equate to "torture" and "unnecessary cruelty[.]" *Wilkerson v. Utah*, 99 U.S. 130, 136 (1878). It was not until our modern era, that the Supreme Court initially recognized that the Eight Amendment "could be applied to some deprivations that were not specifically part of the sentence but were suffered during imprisonment." *Wilson v. Seiter*, 501 U.S. 294, 297 (1991); *Estelle v. Gamble*, 429 U.S. 97, 105-106 (1976). In fact, *Estelle* was the first instance it was even suggested that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain,'" were "proscribed by the Eighth Amendment." (*Id.*). Even with this expansive interpretation of the Eighth Amendment, the Court clarified that "inadvertent failure to provide adequate medical care," or of a "negligent… diagnosis," failed to establish the requisite culpable state of mind for an Eighth Amendment violation. (*Id.*). "Because the provision of medical care for a prisoner is not explicitly part of the sentence imposed, that care's inadequacy constitutes a 'cruel and unusual punishment[]' only if the government actor, at a minimum, knew the care provided or withheld presented a serious risk to the inmate and consciously disregarded that risk." *Rhinehart v. Scutt*, 894 F.3d 721, 737 (6th Cir. 2018). "As a result, '[a]n accident, although it may produce added anguish, is not on that basis alone to be

characterized as wanton infliction of unnecessary pain." (*Id*. at 737-38, citing, *Estelle*, 429 U.S. at 105).

At best, Creech's claim resembles a state tort medical malpractice claim, which fails to trigger protections under the Eighth Amendment—and certainly not the Fourteen Amendment. It is now well-settled that in order to meet the constitutional threshold of deliberate indifference, an inmate must show that medical provider acted with "'obduracy and wantonness' rather than 'inadvertence or error in good faith[.]'" *Rhinehart*, 894 F.3d at 737, citing, *Seiter*, 501 U.S. at 299. Hence, "'[w]here a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims that sound in state tort law.'" *Graham ex rel. Estate of Graham v. Cnty. of Washtenaw*, 358 F.3d 377, 385 (6th Cir. 2004). Moreover, a claimant's "desire for additional or different treatment" fails to state a claim. *Rhinehart*, 894 F.3d at 740. Plainly stated, "negligent medical treatment does not state a claim under the Eighth Amendment." *Johnson v. Nino*, 48 F. App'x 514, 516 (6th Cir. 2002); *see Rumsey v. Martin*, 28 Fed. App'x 500, 502 (6th Cir. 2002) (same). "Deliberate indifference is not medical malpractice; the Eighth Amendment doesn't codify common law torts." *Arnett v. Webster*, 658 F.3d 742, 758 (7th Cir. 2011). With the Fourteenth Amendment, Congress never intended the "constitutionalization of medical malpractice claims[.]" *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001). In that regard, "[w]hen a prison doctor provides treatment, albeit carelessly or inefficaciously, to a prisoner, he has not displayed a deliberate indifference to the prisoner's needs, but merely a degree of incompetence which does not rise to the level of a constitutional violation." (*Id.)* Neither he Eighth Amendment, nor the Fourteenth Amendment, were ever intended to require that medical personnel adhere to the prevailing standard of care.

Title II of the American with Disabilities Act exceeds Congress's authority under Section 5 of the Fourteenth Amendment for acts covered by traditional tort law, and as applied to this case, and thus, Congress failed to validly abrogate Ohio's Eleventh Amendment Immunity. The legislative record for the ADA fails to demonstrate any pattern of discrimination against persons with disabilities by states prison officials in how they provide for medical care. See, 42 U.S.C. 12101(1)-(9). The official congressional findings fail to identify any reference to constitutional violations by state prison officials against incarcerated inmates while providing medical care.

The powers conferred on Congress by Section 5 to enact legislation are "corrective and preventive, not definitional." *City of Boerne*, 521 U.S. at 525. Thus, to properly enact legislation under Section 5 against the States, Congress must "identify conduct" by the States "transgressing the Fourteenth Amendment's substantive provisions[.]" *Florida Prepaid Postsecondary Educ. Expense Bd. v. College Savings Bank*, 527 U.S. 627, 635 (1999). With the passage of Title II, Congress never intended for federal courts to second guess medical decisions made by prison officials with regards to the medical care provided to prisoners. Neither the House nor Senate Reports contain any indication that Congress was overly concerned about how medical care is provided in state penitentiaries.  S. Rep. No. 101-116, 101st Cong., 1st Session, 44 (1989); H.R. Rep. No. 101-485(IV), 101st Cong., 2d Session 24 (1990). To be precise, "States are not required by the Fourteenth Amendment to make special accommodations for the disabled, so long as their actions toward such individuals are rational." *Garrett*, 531 U.S. at 367. The legislative record fails to contain evidence of widespread discrimination by state officials against prisoners in context of medical care in state facilities as to services and programs. In other words, "in order to authorize private individuals to recover money damages against the States, there must be a pattern of discrimination by the States which violates the Fourteenth Amendment, and the remedy imposed

by Congress must be congruent and proportional to the targeted violation." (*Id*. at 374). In this case, there are no congressional reports or findings that Title II was needed to alleviate discrimination against inmates, in the context of medical care, in prisons.

"Congress does not enforce a constitutional right by changing what that is." *City of Boerne*, 521 U.S. at 519. Thus, "Title II creates a private cause of action for damages against the States for conduct that *actually* violates the Fourteenth Amendment[.]" *Georgia*, 546 U.S. at 151. (emphasis added.) Thus, Section 5 legislation must be congruent and proportional to "the injury being prevented" and the "means adopted to that end." (*Id.*, at 520). "Section 5 does not broadly enlarge Congressional authority" to enforce traditional tort law against the states. *Garrett*, 531 U.S. at 374. In other words, Section 5 allows Congress to enforce the Fourteenth Amendment, not medical decisions covered by traditional state tort law—like the issuance of cane for mobility in a prison. The decision by ODRC officials to grant or deny the use of cane does not implicate the Fourteenth Amendment, but rather, it is instead the type of decision that falls within the parameters of medical malpractice, which falls under the realm of traditional state tort law. *Swain*, 2020 U.S. App. LEXIS 18689, *23 (11th Cir. 2020) ("deliberate indifference is *not* a constitutionalized version of common-law negligence.") Furthermore, Title II is not proportional given that covers acts well beyond the reach of the Fourteenth Amendment. *Kimel*, 528 U.S. at 81. Section 5 does not authorize Congress to reinterpret, by way of Title II, the Eighth Amendment's deliberate indifference into "a font of tort law—a brand of negligence redux—which the Supreme Court has made abundantly clear it is not." *Swain*, 2020 U.S. App. LEXIS at *24. In other words, federal courts must refrain from "blurring the lines between the state court's enforcement of their tort laws and the federal courts' enforcement of the Constitution." *Leary v. Livingston*, 528 F.3d 438, 445 (6th Cir. 2008). Under Plaintiff's claims, not only would Title II go beyond the Fourteenth

23

Amendment, but it would circumvent the Eighth Amendment, and transgress the realm of traditional tort law. While Section 5 enforcement power authorizes legislation to prevent and deter violations of the Fourteenth Amendment "by prohibiting a somewhat broader swath of conduct . . . [than is] forbidden by the Amendment's text," *Kimel,* 528 U.S. at 81*,* Plaintiff's attempt to apply Title II into areas of state traditional tort law is misguided, and Congress' authority to abrogate Eleventh Amendment Immunity cannot reach this case.

**2. The evidence clearly refutes Plaintiff's argument that he was discriminated against based on his "disability."**

"Title II of the ADA . . . extends to state prison inmates." *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 213 (1998). Title II of the ADA states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. "'To establish a *prima facie* case of intentional discrimination under Title II of the ADA, a plaintiff must show that: (1) she has a disability; (2) she is otherwise qualified; and (3) she was being excluded from participation in, denied the benefits of, or subjected to discrimination under the program because of her disability.'" *Tri-Cities Hldgs, LLC v. Tenn. Admin. Procedures Div.*, 726 F. App'x 298, 308 (6th Cir. 2018) (quoting *Anderson v. City of Blue Ash*, 798 F.3d 338, 356 (6th Cir. 2015)). *See also Ability Ctr. of Greater Toledo v. City of Sandusky*, 385 F.3d 901, 907 (6th Cir. 2004) ("Title II does more than prohibit public entities from intentionally discriminating against disabled individuals. It also requires that public entities make reasonable accommodations for disabled individuals so as not to deprive them of meaningful access to the benefits of the services such entities provide."). "In the typical Title II case, the plaintiff alleges she was denied reasonable

accommodations in violation of the Act." *Sjostrand v. Ohio State Univ.*, 750 F.3d 596, 599 (6th Cir. 2014).

A disability determination by the Social Security Administration, even if substantiated, is not controlling for determination of ADA disability. *Thornton v. Fed. Express Corp.*, 530 F.3d 451, 455 (6th Cir. 2008); *McNeill v. Wayne County*, 300 F. App'x 358, 362 (6th Cir. 2008) (rejecting the plaintiff's argument that a record of her Social Security disability benefits controlled determination of her ADA disability). The Supreme Court has compared the two procedures for determining disability and concluded that an individual qualifying for Social Security disability could otherwise fail to be substantially limited in performing major life activities under the ADA. *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 803–04 (1999). The Court also declined to find the disability designations equivalent because the Social Security Administration's procedure involves a variety of presumptions, including a list of automatically qualifying impairments that are distinct from the ADA's definition. (*Id.* at 804–05).

Under the first element, the ADA defines "disability" as:

(D) a physical or mental impairment that substantial limits one or more of the major life activities of such individual;

(E) a record of such an impairment; or

(F) being regarded as having such an impairment.

42 U.S.C. § 12102(2). "Acts and omissions which have a disparate impact on disabled persons in general [are] not specific acts of intention discrimination against [the plaintiff] in particular." *Dillery*, 398 F.3d at 568 (quoting *Tyler v. City of Manhattan*, 118 F.3d 1400, 1403 (10th Cir. 1997)). Allegations that "defendants denied him treatment in retaliation for filing grievances an in an effort to cut cost," is not a sufficient showing of discrimination because of disability. *O'Brien*

*v. Mich. Dep't of Corr.,* 592 Fed. Appx. 338, 344, LEXIS 24722 at *13, 2014 WL 7533852 (6th Cir. Oct. 17, 2014).

Plaintiff cannot establish a prima facie case under the ADA for two reasons. First, serious doubt exists as to whether Plaintiff is qualifiedly disabled. 42 U.S.C. § 12131 defines "qualified individual with a disability" as "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices . . . meets the essential eligibility requirements for receipt of services or the participation in programs or activities provided by a public entity." Although Plaintiff has numerous injuries and requires chronic care, he cannot show that he met essential requirements to participate in any programs or activities, provided by the prison. Namely, he was not participating in any specific programming before or after his cane was removed. (Exhibit E, p. 129)

Second, Plaintiff cannot because he fails to show how he was discriminated against on the basis of his knee or back injuries. *Dillery v. City of Sandusky,* 398 F.3d 562, 567 (6th Cir. 2005) (plaintiffs must show discrimination followed solely as a result of their disability (citing *Jones v. City of Monroe,* 341 F.3d 474, 477 (6th Cir. 2003))). Even though "[t]he ADA's prohibition of discrimination in services, programs, or activities "'encompasses virtually everything a public entity does,'" Plaintiff still cannot satisfy this element of the prima facie case. *Jones v. City of Monroe,* 341 F.3d at 477 (quoting *Johnson v. City of Saline*, 151 F.3d 564, 569 (6th Cir. 1998)). In fact, Creech concedes that the restrictions placed upon him were done so voluntarily. (Doc. 66-1, PageId # 538-548). Plaintiff chose not to go to the yard every day, he chose to eat all of his food from the commissary, and he chose not to participate in activities in the prison. (Doc. 66-1, PageId # 541-74). Plaintiff testified during his deposition that he was not precluded for participating in activities in the prison by any of the prison staff, in fact, he made the choice not to participate.

(Doc. 66-1, PageId # 574) Plaintiff chose, voluntarily, not to go to the chow hall for food. (Doc. 66-1, PageId # 541-542). Plaintiff was afforded the luxury, through his family support system, to purchase enough food items through the commissary to not require the use of the chow hall on a daily basis. (Doc. 66-1, PageId # 543) There is no evidence that any prison official prohibited him from participating in any program, service, event, or activity due to his disability.

Plaintiff cannot show that he was denied treatment because of his disability. Although, Plaintiff throughout his complaint invokes very specific language of discrimination, such as "required a cane," "health … adversely affected," and "potential (sic) harmful and even dangerous," he does not allege that he was denied treatment, programs, activities, or anything similar because of his disability.  (Doc. 17, PageId # 40-41). Not only does the amended complaint lack any specific allegations of discrimination on the basis of disability, but all actions taken by CCI staff regarding Plaintiff's treatment were based on the professional medical opinions of staff. (*See* Exhibits A & B).

### 3.    Creech's claim is time barred by the statute of limitations.

Plaintiff's complaint was filed beyond Ohio's two-year statute of limitations and is thus barred. A claim is untimely "when it is apparent from the face of the complaint that the time limit for bringing the claim has passed." *Hoover v. Langston Equip. Assocs.*, 958 F.2d 742, 744 (6th Cir. 1992). "Because Congress did not specifically adopt a statute of limitations governing § 1983 actions, 'federal courts must borrow the statute of limitations governing personal injury actions in the state in which the section 1983 action was brought.'" *Drake v. City of Detroit, Mich.*, 266 F. App'x 444, 448 (6th Cir. 2008) (quoting *Banks v. City of Whitehall*, 344 F.3d 550, 553 (6th Cir. 2003). Likewise, the ADA itself does not contain a statute of limitation, so federal courts must use the statute of limitation for the state cause of action most similar to the ADA claim. (*Id.* at 4; *see also Wilson v. Garcia*, 471 U.S. 261, 266-67 (1985)). District courts in Ohio have determined that the statute of

limitations for an ADA claim is two years. *Post v. Mohr*, No. 1:11-cv-1533, LEXIS 2944 at *11, 2012 WL 76894 (N.D. Ohio, Jan. 10, 2012). Because the ADA does "not set forth its own statute of limitations, the appropriate statute of limitations for a Title II claim is the two-year limitations period applicable to personal injury actions in Ohio." *McCormick v. Miami Univ.*, 693 F.3d 654, 663-664(6th Cir 2012).

The question of when the statute of limitations begins to run, however, is governed by federal law. *See, e.g.*, *Ruff v. Runyon*, 258 F.3d 498, 500 (6th Cir. 2001) (citing *Wilson v. Garcia*, 471 U.S. 261, 268-71, 105 S. Ct. 1938, 85 L. Ed. 2d 254 (1985)). "The 'standard rule' is that a cause of action accrues 'when the plaintiff has a complete and present cause of action, that is, when the plaintiff can file suit and obtain relief.'" *D'Ambrosio v. Marino*, 747 F.3d 378, 384 (6th Cir. 2014) (quoting *Wallace v. Kato*, 549 U.S. 384, 388 (2007). The Sixth Circuit has This court has applied Ohio's two-year statute of limitations governing personal injury actions to Ohio cases arising under § 1983, the ADA, and the Rehabilitation Act. *Endres v. Ne. Ohio Med. Univ.*, 938 F.3d 281, 292 (6th Cir 2019). *McCormick*, 693 F.3d at 663 (applying two-year period to ADA suit). "To determine when that period began, we turn to federal law, which provides that 'the limitations period starts to run when the plaintiff knows or has reason to know of the injury which is the basis of his action.'" *Baker v. Bryant & Stratton Coll.*, 2018 U.S. App. LEXIS 24973, *2-3 (quoting *Kuhnle Bros., Inc. v. Cty. of Geauga*, 103 F.3d 516, 520 (6th Cir. 1997) (internal citations omitted)).

Here, based on Plaintiff's own admissions, the factual allegations regarding his claims for discrimination under the ADA occurred on August 23, 2016. (Doc. 17, PageId# 40). Yet the face of the complaint undoubtedly shows Plaintiff did not file this action until January 18, 2019, more than two full years after his allegation. (*See* Doc. 2). As stated by the *D'Ambrosio* Court, Plaintiff

had a complete and present cause of action on the date his cane was removed. *D'Ambrosio*, 747 F.3d at 384. Therefore, Plaintiff should have brought suit on or before August 23, 2018.

## VI.    CONCLUSION

There is no genuine issue of material fact. Plaintiff's claims are barred by Eleventh Amendment immunity. Defendant ODRC did not discriminate against Plaintiff based on his disability, nor was the removal of his cane a violation of the Americans with Disabilities Act. There is no genuine dispute of material fact in this case. Plaintiff's request for injunctive relief is moot as he is currently in possession of a cane. This Court should grant Defendant ODRC's motion for summary judgment.

Respectfully submitted,

 DAVE YOST (0056290)
Ohio Attorney General

*/s/ Thomas E. Madden*
THOMAS E. MADDEN (0077069)
       *\*Lead and Trial Attorney*
MARGARET S. MOORE (0096813)
Assistant Attorneys General
Criminal Justice Section
150 East Gay Street – 16th Floor
Columbus, Ohio 43215
Tel: (614) 995-3234\Fax: (866) 239-5489
Thomas.madden@ohioattorneygeneral.gov
Margaret.moore@ohioattorneygeneral.gov
*Counsel for Defendant*

29

## CERTIFICATE OF SERVICE

I certify that the foregoing *Defendant's Motion for Summary Judgment* was filed electronically in the Court's ECF system on September 14, 2020, and was served to Scott David Creech, #A588782, Chillicothe Correctional Institution, 15802 State Route 104, North Chillicothe, Ohio 45601 by U.S. Mail on September 15, 2020.

/s/ *Thomas E. Madden*
THOMAS E. MADDEN (0077069)
Senior Assistant Attorney General